79 A.3d 1053

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Glenn LYONS, Appellant.**

Supreme Court of Pennsylvania.

Submitted Nov. 20, 2012.

Decided Oct. 30, 2013.

96

98

Timothy Alan Biltcliff, Esq., Berks County Public Defender's Office, for Glenn Lyons.

Jonathan H. Kurland, Esq., Berks County District Attorney's Office, Amy Zapp, Esq., PA Office of Attorney General, for Commonwealth of Pennsylvania.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, STEVENS, JJ.

## *OPINION*

Justice TODD.

Glenn Lyons appeals the judgment of sentence of death imposed on July 15, 2011 by the Court of Common Pleas of

Berks County after a jury convicted him of first-degree and third-degree murder. For the following reasons, we affirm.

## I. Factual and Procedural History

This matter arises from the May 1, 2008 disappearance and death of Kathy Leibig in Berks County, Pennsylvania. That evening, Leibig's husband returned home from work to find her missing, and, when she did not return by morning, he reported her disappearance to police. N.T., 5/26/11–5/27/11, at 171–81. In the ensuing investigation, officers reviewed Leibig's mobile telephone records, discovering over 100 calls, including her most recent call, between her mobile telephone and two numbers registered to Appellant. *Id.* at 181–83, 255–57. The officers sought to contact Appellant via telephone and at his Reading apartment concerning Leibig's whereabouts, but to no avail. *Id.* at 257–58.

Subsequently, on May 4, 2008, a bystander spotted Leibig's car in a Berks County parking lot. Her husband rushed to the scene, where he discovered her body in the bloodied cabin of her car, naked from the waist down and apparently dead from numerous stab wounds to her head and upper body. *Id.* at 19–27, 65–90, 167–69; N.T., 5/30/11–6/2/11, at 199–217. Officers processed the crime scene, taking numerous photographs depicting the area, the car, and the location and position of the body, prepared various items for forensic testing, and recovered two broken kitchen knives apparently used in the attack. N.T., 5/26/11–5/27/11, at 38–43, 65–90.

Later that day, Trooper Thomas Weaver took a statement from Betsy Rupp, who identified herself as Appellant's girlfriend, and who had previously worked with both Leibig and Appellant at a local candy store. *Id.* at 218–19, 223. Rupp indicated that Leibig and Appellant were involved in a relationship and that, the previous day, Appellant had called her in distress. *Id.* at 219, 224–26. Rupp told Trooper Weaver that, during the call, she asked why Appellant had not called her, and he responded that he was "on the run" in Northeast Philadelphia, would not be returning to Reading, and that she

could have anything she wanted from his apartment. *Id.* at 225–28.

At 11:25 p.m., Trooper James Biever, the lead investigator assigned to the case, sought and obtained a warrant to search Appellant's apartment for evidence related to Leibig's death. N.T., 8/14/09, at 68; *see also id.* at 232–36. In addition to the foregoing facts, Trooper Biever indicated in the affidavit of probable cause in support of his warrant request that he suspected that Appellant had killed Leibig, and that, in his experience, the perpetrators of such gruesome crimes often unwittingly transfer trace evidence to their homes. *Id.* He further averred that "most residences contain ... knives." *Id.* at 234.[1] At approximately 11:42 p.m., Trooper Biever and several other officers executed the warrant, finding Appellant's lights and television were still on, and recovering, *inter alia,* two kitchen knives from Appellant's dish strainer. *Id.* at 235; N.T., 5/26/11–5/27/11, at 46–51.

Meanwhile, Appellant fled from Reading to Lebanon, where he saw Justin Grube dealing drugs on the street. *Id.* at 372–73. Appellant asked to buy some cocaine, and Grube indicated he would have to obtain it from the nearby home of a friend. *Id.* at 374–75. Appellant agreed to that arrangement and, while awaiting Grube's return, he threw a bag into a nearby dumpster, an act which was partially captured on a nearby surveillance camera. *Id.* at 375–82. That bag was later revealed to contain Leibig's personal effects and a grey, bloodstained sweatshirt. N.T., 5/30/11–6/2/11, at 41–54, 76–80.

Grube returned with cocaine and, throughout the next several days, Appellant and Grube engaged in a lengthy drug binge that included two trips to the Philadelphia region and numerous visits with Grube's associates. N.T., 5/26/11–5/27/11, at 316–20, 323–26, 330–37, 343–50, 353–56, 372–74, 386–92. Relevant to Appellant's defense, discussed below,

1. Although Trooper Biever did not explicitly aver in the affidavit of probable cause that he wished to search the apartment at night, he did note "it is important to immediately locate any information" that might aid in locating Appellant, and the issuing authority permitted the search at any time. *See* N.T., 8/14/09, at 232–34.

none of the individuals they visited observed him with any scratches, bruises, or other injuries. N.T., 5/26/11–5/27/11, at 319–20, 326, 330, 349, 356, 378.

On May 8, 2008, Appellant was apprehended in Philadelphia and taken into custody at the Pennsylvania State Police–Belmont Barracks, where Trooper Biever and Trooper William Moyer, Jr. interviewed him about Leibig's death. N.T., 8/14/2009, at 50–51, 72–73. The troopers advised Appellant that they wanted to talk about the crime and advised him of his Miranda rights, and Appellant indicated that, while he wanted to talk about what had happened, he did not want to sign a waiver form because he distrusted police. *Id.* at 74–75. Appellant explained that, in his view, he had been wrongfully accused and convicted of various crimes in the past. *Id.* Trooper Biever responded that, in order for them to conduct the interview, he had to be advised of his rights. *Id.* at 75. Thereafter, he reappraised Appellant of those rights, and the officers continued to talk about his distrust of police, but, after approximately 20 minutes, Appellant agreed to waive his Miranda rights in writing. *Id.* at 75–78.

In the ensuing dialogue, Appellant told the officers that, on the morning of Leibig's death, the two had eaten breakfast together and become intimate in Leibig's car, when a man in a yellow hooded sweatshirt opened the door, attacked him, and knocked him out. N.T., 5/26/11–5/27/11, at 281–82. Appellant claimed that he awoke in his own car, scratched and bruised, and returned to Leibig's car, where he found her lying down with her eyes open. *Id.* at 283. Appellant indicated that he hugged her, kissed her, turned off the car, and blacked out again. *Id.* He indicated that he had been wearing a grey hooded sweatshirt during the attack and, when asked directly, denied killing Leibig. *Id.* at 283–85. After listening to Appellant's account, Corporal Moyer indicated that, if there were surveillance tapes at the parking lot, they would not show a man in yellow sweatshirt, and Appellant responded "well, you know what happened" and indicated he was "sticking to [his] story." *Id.* at 286. Subsequently, the officers asked him to review his statement for accuracy, but Appellant indicated he

would not do so, and invoked his privilege against self-incrimination, terminating the interview. N.T., 8/14/09, at 82.

On December 29, 2008, Appellant was charged with first-degree murder, 18 Pa.C.S.A. § 2502(a), and third-degree murder, 18 Pa.C.S.A. § 2502(c), and the Commonwealth subsequently filed notice of its intent to seek the death penalty, citing aggravating factors of torture, 42 Pa.C.S.A. § 9711(d)(8), and a significant history of violent felonies, *Id.* § 9711(d)(9). Appellant filed an omnibus pretrial motion seeking, *inter alia,* (1) suppression of the evidence gleaned from the search of his apartment on the ground it was obtained via a warrant lacking probable cause and, in the alternative, on the ground it was obtained via a warrant executed in violation of the night-time search requirements of Pa.R.Crim.P. 203(E); and (2) suppression of the foregoing statements to Troopers Biever and Moyer on the ground they were obtained via an involuntary waiver of his Miranda rights. The trial court held a hearing on the motion and denied relief of both claims. Appellant also filed a motion *in limine* to preclude or otherwise limit the introduction of 14 crime scene and autopsy photographs, arguing that their probative value was outweighed by their prejudicial effect. The trial court held another hearing and, thereafter, granted partial relief, precluding the admission of two of the challenged photographs and ruling that the others be introduced only in black and white format.

On May 25, 2011, Appellant proceeded to a jury trial before the Honorable Paul M. Yatron of the Court of Common Pleas of Berks County. Relevant to the instant appeal, the principal dispute was whether Appellant or the alleged yellow-hooded man had committed the crime. Accordingly, the Commonwealth sought in various ways to discredit the notion of an alternate perpetrator. Most directly, the Commonwealth presented testimony that, after the crime, Appellant admitted to committing the murder. Justin Grube testified that, during their drug binge, Appellant hinted at hurting Leibig numerous times and indicated that he took her personal effects to make the crime look like a robbery. N.T., 5/26/11–5/27/11, at 392–

95. Similarly, Ivory Perkins, who had come to know Appellant in jail, testified Appellant had outright confessed, explaining that he had killed Leibig because she wanted to end their affair. *Id.* at 312–13.

In addition to these inculpatory statements, the Commonwealth elicited evidence linking the murder weapons discovered in Leibig's car to the knives recovered from Appellant's apartment. To this end, it called Clyde Liddick, an expert in trace evidence analysis, who testified at length as to his comparison of the knives, noting they shared many common characteristics and opining that they may reasonably be part of the same set. N.T., 5/26/11–5/27/11, at 140–43, 158. Liddick explained that the murder weapons and Appellant's knives had identical blade width, blade thickness, blade serrations, handle length, handle width, handle chemical composition, and handle pigment composition. *Id.* at 155–59. Liddick further indicated that the murder weapons' blade length was identical to one of the Appellant's knives, and roughly a centimeter shorter than the other. *Id.* On cross examination, Liddick agreed that he was unaware of the total number of similar knives in circulation, and that he was not absolutely certain that the knives were from the same manufacturer and set. *Id.* at 160–63.

The Commonwealth also sought to demonstrate that the discarded grey sweatshirt bore a mixture of Leibig's and Appellant's DNA and that Leibig's assailant wore it during the murder. Lisa Shutfuski, a Commonwealth expert in DNA analysis, opined that the sweatshirt contained a mixture of two individuals' blood and, by quite long odds, likely established Leibig and Appellant as the sources. N.T., 5/30/11–6/2/11 at 143–45. Specifically, Shutfuski indicated that the odds that the DNA profiles present on the sweatshirt would appear randomly in the population would be somewhere between 1 in 980 quadrillion to 1 in 600 quintillion for Leibig's profile and between 1 in 42,000 and 1 in 120,000 for Appellant's profile. *Id.*[2] Similarly, Dr. Mark Perlin, another Commonwealth expert

2. One trillion equals $10^{12}$, one quadrillion equals $10^{15}$, and one quintillion equals $10^{18}$.

in DNA analysis, applied a different method of statistical analysis and determined those odds were roughly 1 in 127 trillion for Leibig's profile and 1 in 946 billion for Appellant's profile. *Id.* at 178–80.[3]

Appellant sought to rebut the Commonwealth's evidence in principally two ways. First, he presented the testimony of his own DNA expert, Laura Keller, who indicated Leibig's fingernails did not contain Appellant's DNA. N.T., 5/30/11–6/2/11, at 240–42. Second, in an apparent attempt to explain the DNA mixture on his sweatshirt, Appellant testified that, consistent with his prior statement, he had hugged Leibig after the attack and bloodied his clothes, which he subsequently threw away. *Id.* at 253–62, 279.[4]

Notably, however, the Commonwealth presented testimony tending to undermine both lines of rebuttal. Dr. Neil Hoffman, the forensic pathologist who performed Leibig's autopsy, indicated that her fingernails were quite short, and that they would make it difficult to scratch her assailant and acquire his DNA. *Id.* at 223–25. Moreover, both Dr. Hoffman and Robert Bonczek, a blood spatter and serology expert, opined that the unique nature of the bloodstain on the grey sweatshirt precluded the possibility that it was caused by a hug, but rather concluded it directly spattered onto the sweatshirt, suggesting it was present during the murder. *Id.* at 116–17, 218–20.

Finally, the Commonwealth presented testimony as to the nature of the attack itself. Dr. Hoffman testified that Leibig died as a result of exsanguination from some 30 stab wounds to her face, chin, head, neck, shoulder, and chest, some fatal and some nonfatal. *Id.* at 199–217. Dr. Hoffman noted in particular that one of the wounds, a c-shaped wound through Leibig's jugular vein and carotid artery, would have been sufficient to cause her death. *Id.* He further indicated that

3. Dr. Perlin initially testified that the likelihood ratios were approximately ten times higher, but explained that he revised those ratios to account for certain genetic issues related to Leibig's and Appellant's potential for co-ancestry.

4. Curiously, Appellant also denied that the bloodied grey sweatshirt belonged to him. *Id.* at 283.

Leibig had sustained various defensive wounds, including wounds to her hands, and that she had sustained an abrasion on her face consistent with having her face pressed or rubbed against the vehicle's console. *Id.*[5] Based on those defensive wounds and the lack of any evidence that her heart, brain, or central nervous system were impaired, Dr. Hoffman opined that Leibig was likely conscious throughout the entire attack, which he indicated lasted somewhere between 2 and 15 minutes. *Id.* at 213–17.

On June 2, 2011, the jury returned a guilty verdict on the charges of first-degree and third-degree murder. Appellant proceeded to the penalty phase, after which the jury returned a verdict of death, finding that the aggravating factors of torture and significant history of violent crime outweighed the mitigating circumstances of drug and alcohol abuse, upbringing and poverty, exposure to violence, and possible personality disorder not otherwise specified. Subsequently, on July 15, 2011, the trial court sentenced Appellant to death for first-degree murder, and found the conviction for third-degree murder merged, for sentencing purposes, with that conviction.

Appellant filed a post-sentence motion arguing, *inter alia,* (1) the verdict was based on insufficient evidence and against the weight of the evidence; (2) the jury's finding of torture was based on insufficient evidence; and (3) he was entitled to retrial on the ground of after-discovered evidence that Justin Grube told his child's mother, Amber Rittenhouse, that he had been involved in the crime. The trial court held a hearing on the motion, primarily directed at the after-discovered evidence claim. At the hearing, Rittenhouse testified that, during their drug binge in May 2008, Grube and Appellant also went to her house. N.T., 10/13/2011, at 5. Rittenhouse further indicated that, afterward, Grube told her that he and Appellant attempted to rob Leibig, but the attempt failed, and that he helped Appellant get rid of evidence. *Id.* at 6. Rittenhouse testified that she had not told Trooper Biever about this exchange until

5. Additionally, Bonczek testified that a blood pattern on the driver's seat indicated someone had attempted to flee to the front seat. *Id.* at 115.

after the trial. *Id.* at 7–8. On December 14, 2011, the trial court denied the post-sentence motion. Appellant timely appealed to this Court, raising seven issues discussed below.

## II. Analysis

### A. Sufficiency of the Evidence

First, Appellant argues the evidence presented at trial was insufficient to support his conviction for first-degree murder. In reviewing the sufficiency of the evidence, this Court determines whether the evidence presented at trial, combined with all reasonable inferences therefrom, is sufficient to conclude that the Commonwealth has established each element of the offense beyond a reasonable doubt. *Commonwealth v. Smith*, 604 Pa. 126, 141, 985 A.2d 886, 894–95 (2009). In applying this standard, we bear in mind that the Commonwealth may sustain its burden entirely by means of circumstantial evidence, and the jury as finder of fact is entitled to credit all, part, or none of the evidence presented at trial. *Commonwealth v. Cousar*, 593 Pa. 204, 217, 928 A.2d 1025, 1032–33 (2007). In order to prove the offense of first-degree murder, the Commonwealth must demonstrate that the accused killed another human being with malice and specific intent to kill. *Commonwealth v. Briggs*, 608 Pa. 430, 455–56, 12 A.3d 291, 306 (2011). Evidence that the accused used a dangerous weapon on a vital part of the victim's body, causing her death, is sufficient to make that demonstration. *Commonwealth v. O'Searo*, 466 Pa. 224, 236, 352 A.2d 30, 36 (1976).

Appellant does not contend that the evidence was insufficient to prove that Leibig's assailant committed first-degree murder; rather, he contends another assailant committed the murder. Nevertheless, consistent with this Court's practice in direct capital appeals, we will independently review the sufficiency of the evidence in all respects. *See Commonwealth v. DeJesus*, 580 Pa. 303, 308, 860 A.2d 102, 105 (2004). As noted *supra*, pursuant to our decision in *O'Searo*, a jury's determination that the accused engaged in first-degree murder is supported where there is evidence to suggest that he used a deadly weapon on a vital part of the victim's body,

thereby causing her death. *O'Searo,* 466 Pa. at 236, 352 A.2d at 36. Here, Dr. Hoffman testified that Leibig died as a result of at least 30 stab wounds to her face, head, neck, shoulder, and chest, ultimately bleeding to death in the back seat of her car. Thus, under *O'Searo,* the jury was permitted to conclude that her assailant used a deadly weapon on a vital portion of her body, killed her with malice and specific intent, and, thus, committed first-degree murder.

Yet, as noted *supra,* the predominant issue at trial was not whether the offense committed amounted to first-degree murder, but whether it was committed by Appellant or by an unknown, yellow-hooded man. Appellant argues that the evidence at trial failed to conclusively establish his identity as the perpetrator. First, he suggests that Clyde Liddick's comparison of the murder weapons to the knives recovered from his apartment held no evidentiary value. He suggests that, because Liddick had no knowledge of the number of similar knives in circulation, and because the second of Appellant's knives had a slightly larger blade as compared to the murder weapon, his conclusion that the knives were of similar character and composition is invalid. Appellant contends that, on balance, Liddick's testimony "proved only that a knife that may be a common household utensil was found in [Appellant's] apartment" and that "it is far from reasonable that the murder weapons . . . came from Appellant's apartment." Appellant's Brief at 35.

Appellant also assails the DNA evidence presented against him as inconclusive and, in any event, consistent with his alternate perpetrator theory. He notes that both Shutfuski and Dr. Perlin testified that, due to the fact that a mixture of blood was present on his grey sweatshirt, DNA analysis is not entirely conclusive and rests on probability. Appellant contends "the mixture of DNA found on [the grey hooded sweatshirt] does not conclusively include Appellant's DNA. It merely does not exclude his DNA." Appellant's Brief at 36. Moreover, Appellant argues, even if his and Leibig's DNA were present on the grey sweatshirt, it merely corroborates his own testimony that, after waking up in his car, he re-

turned to Leibig's vehicle and hugged her before he fled, transferring her blood onto his sweatshirt.

Rejecting Appellant's claim, the trial court noted in its Pa.R.A.P.1925(a) opinion that, consistent with *Cousar*, the Commonwealth may prove its case solely on the basis of circumstantial evidence. The court observed that, while not dispositive, Clyde Liddick's testimony as to the similarity of the murder weapons and the knives discovered in Appellant's apartment was quite persuasive. Further, citing this Court's decision in *Commonwealth v. Crews*, 536 Pa. 508, 640 A.2d 395 (1994), the trial court observed that DNA evidence is never conclusive, but, rather, is probabilistic in nature, and that its persuasiveness is properly a matter for the jury.[6] Finally, it further noted that, even if no mixture of Appellant's and Leibig's DNA had been found on the sweatshirt, there remained sufficient evidence to convict him of first-degree murder.[7]

We reject Appellant's contention. In addition to testimony that the two were involved in an affair and in frequent contact up until the time of the crime, the Commonwealth offered testimony that the crime was accomplished with knives similar to those in Appellant's home, that Leibig's blood spattered onto a sweatshirt that—by astronomical odds—likely contains a mixture of Appellant's and Leibig's DNA, that Appellant fled after the crime, disposing of evidence that included that same sweatshirt along the way, and that he subsequently made numerous statements implicating himself as Leibig's killer, including his confession to Ivory Perkins that he committed the crime because Leibig wanted to end their relationship. Based on that record, we conclude a jury could reasonably find beyond a reasonable doubt that Appellant was Leibig's assailant. Additionally, while Appellant is

6. Likewise, in its opinion denying Appellant's post-sentence motion, the trial court observed that, while Appellant was free to pursue a theory that a yellow-hooded man was the assailant, the jury was free to disbelieve him.

7. In its brief, the Commonwealth relies on the trial court's disposition of this claim.

correct that the mere fact that a mixture of his and Leibig's DNA was present on the grey sweatshirt is consistent with his testimony that he hugged Leibig after the attack, he entirely ignores the testimony of Dr. Hoffman and Bonczek that contradicts his own: that the blood spatter was inconsistent with such a passive transfer and, rather, actually spattered onto Appellant's sweatshirt. Moreover, the jury, as the arbiter of witness credibility, was entitled to credit Mr. Bonczek's opinion over Appellant's own testimony and discredit Appellant's version of events. *See Cousar, supra.* Accordingly, we conclude the evidence was more than sufficient to sustain Appellant's conviction for first-degree murder.

## B. Motion to Suppress Evidence

Next, Appellant contends the trial court erred in denying his motion to suppress the evidence found in his apartment, arguing the warrant permitting the search was invalid because it was not supported by probable cause. Under the federal and state constitutional prohibitions of unreasonable searches and seizures, both the United States Supreme Court and this Court have consistently held that, subject to certain exceptions, a search is constitutionally invalid unless it is conducted pursuant to a warrant issued by a neutral and detached magistrate and supported by probable cause. *Mincey v. Arizona,* 437 U.S. 385, 390, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978); *Commonwealth v. Jones,* 605 Pa. 188, 199, 988 A.2d 649, 655 (2010). Probable cause exists where, based upon a totality of the circumstances set forth in the affidavit of probable cause, including the reliability and veracity of hearsay statements included therein, "there is a fair probability that ... evidence of a crime will be found in a particular place." *Commonwealth v. Johnson,* 615 Pa. 354, 380, 42 A.3d 1017, 1031 (2012) (internal quotation marks omitted). In reviewing an issuing authority's decision to issue a warrant, a suppression court must affirm unless the issuing authority had no substantial basis for its decision. *Id.* On appeal, this Court affirms the decision of the suppression court unless it commits

an error of law or makes a factual finding without record support. *Briggs*, 608 Pa. at 478, 12 A.3d at 320.

In its opinion denying suppression of the evidence, the trial court found the affidavit in the instant case "readily justifie[d] the issuance of the search warrant." Trial Ct. Op., 11/9/2009, at 22. Noting the affidavit included Betsy Rupp's statement that Appellant and Leibig were involved in an affair, bolstered by the frequency of their phone calls in the prior month, as well as her statement that Appellant had called her just after the crime and indicated he was "on the run" from Reading and he was not coming back, the court found "more than sufficient" evidence implicating Appellant in the crime. *Id.* at 22–23. Moreover, noting the affidavit's indication that, in Trooper Biever's experience, a perpetrator of such a gruesome crime often transfers trace evidence of the crime to his residence, the court found a substantial basis for the conclusion that evidence of Leibig's death would likely be found in Appellant's home.

In a somewhat scattered argument, Appellant contends suppression was warranted because Trooper Biever's affidavit of probable cause failed to provide a basis upon which to evaluate Rupp's credibility and did not aver that Appellant was present at the crime scene, committed the crime, or owned knives.

In its brief, the Commonwealth contends the instant case is analogous to *Commonwealth v. Hawkins*, 549 Pa. 352, 379–81, 701 A.2d 492, 505–06 (1997), as well as various decisions of the Superior Court, each of which it styles as permitting home searches on the ground the occupants were murder suspects.

In *Hawkins*, a young woman unexpectedly disappeared from her job and, in the ensuing investigation, officers interviewed the appellant on two separate occasions, because his name was discovered in the missing woman's address book. *Id.* During those interviews, the appellant gave several inconsistent and false statements to police concerning his relationship with the victim and whether he had seen her in the days prior to her disappearance. *Id.* Moreover, a third party

indicated to police that she had seen a man who looked like the appellant with the missing woman on the day of her disappearance. *Id.* This court rejected a claim that such circumstances did not amount to probable cause, finding there was a substantial basis to conclude there was probable cause to "suspect[ ] that appellant was involved in the possible murder" of the missing woman. *Id.* at 380, 701 A.2d at 506.

We conclude Appellant is not entitled to relief. First, we reject Appellant's predicate assumption that Trooper Biever, in the affidavit of probable cause, was required to aver facts demonstrating Rupp's credibility and reliability. This Court has repeatedly rejected the argument that an officer relying on statements from an ordinary citizen, in contrast to a police informant, must establish the citizen's credibility and reliability. *See, e.g., Commonwealth v. Weidenmoyer*, 518 Pa. 2, 9–10, 539 A.2d 1291, 1295 (1988) (observing that an ordinary eyewitness, unlike a paid police informant, offers information out of concern for society or personal safety and, consequently, may be presumed credible and reliable); *cf. Commonwealth v. Sudler*, 496 Pa. 295, 305, 436 A.2d 1376, 1380–81 (1981) (noting this presumption applies absent circumstances indicating untrustworthiness). Moreover, while witness credibility and reliability are certainly appropriate considerations in determining probable cause, such technical pleading requirements are inconsistent with the practical, common sense determination of whether the totality of the circumstances presented in the affidavit establish a reasonable likelihood that evidence will be found. *See Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *Commonwealth v. Gray*, 509 Pa. 476, 483–86, 503 A.2d 921, 925–27 (1985).[8]

8. Furthermore, as a factual matter, we disagree with Appellant that Trooper Biever's affidavit failed to provide any basis upon which to evaluate Rupp's credibility. As noted by the trial court, the affidavit indicated that Rupp knew both Appellant and Leibig as co-workers and otherwise, and that phone records were consistent with Rupp's statement that Appellant and Leibig were involved in an affair. Thus, the affidavit not only provided Rupp's basis for knowledge of the affair, but also partially verified her claims.

■ Finally, to the extent Appellant claims that Trooper Biever was somehow required to aver conclusively that he killed Leibig or that knives similar to the murder weapon would certainly be found in his home, we find his claims to be unpersuasive. This Court has repeatedly emphasized that an issuing authority need only make a common sense determination that there was a "fair probability" that evidence of the crime would be found at the place sought to be searched. *See Johnson,* 615 Pa. at 380, 42 A.3d at 1031; *see also Commonwealth v. Baker,* 532 Pa. 121, 126–27, 615 A.2d 23, 25 (1992) (noting probable cause is "based on a finding of ... probability, not a *prima facie* showing of criminal activity"). Although *Hawkins* does not appear to stand for the broad proposition that an individual's mere status as a murder suspect subjects him to search, we find it instructive in this regard. In *Hawkins,* there was a substantial basis in fact showing that the appellant had lied to police to hide his own involvement in the crime. In the instant case, a similar basis exists to suggest Appellant was involved in Leibig's death. The affidavit of probable cause indicated that, prior to Leibig's murder, she was in frequent contact with Appellant, that a co-worker indicated Leibig and Appellant were involved in an extramarital affair, and that, after the murder, Appellant went "on the run" to Philadelphia, apparently abandoning his Reading apartment. It thus suggested that Appellant was likely to have killed Leibig, and, consequently, based upon Trooper Biever's experience, that his home would likely reveal trace evidence of the crime. Appellant advances no error of law or unsupported factual finding that would warrant disturbing the issuing authority's decision, and, consequently, no relief is due with respect to this claim.[9, 10]

9. Appellant also asserts the trial court erred in denying his motion to suppress on the ground that the search of his apartment was, contrary to the requirements of Pa.R.Crim.P. 203(E), conducted at night without a demonstration that a nighttime search was reasonably necessary. Notably, this Court has previously held that a violation of those requirements alone does not warrant suppression. *Commonwealth v. Young,* 524 Pa. 373, 387–88, 572 A.2d 1217, 1224 (1990).

10. Appellant and the Commonwealth also dispute whether Appellant abandoned his apartment and, consequently, any constitutional privacy

114

## C. Motion to Suppress Statement

[15-18] Next, Appellant contends the trial court erred in denying his motion to suppress his statement to Troopers Biever and Moyer, arguing that it was obtained pursuant to an involuntary waiver of his privilege against self-incrimination and right to counsel. As a general rule, because of the inherently coercive nature of police custodial interrogation, statements elicited from an accused in that environment are inadmissible unless the accused was informed of and, *inter alia*, voluntarily waived his privilege against self-incrimination and the right to counsel. *Miranda v. Arizona*, 384 U.S. 436, 471–79, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Commonwealth v. DeJesus*, 567 Pa. 415, 428–30, 787 A.2d 394, 401–03 (2001). Waiver is made voluntarily if the decision to make it is the product of a free and unconstrained choice. *Commonwealth v. O'Bryant*, 479 Pa. 534, 539–40, 388 A.2d 1059, 1062 (1978). In determining whether a waiver is valid, a suppression court looks to the totality of the circumstances surrounding the waiver, including but not limited to the declarant's physical and psychological state, the attitude exhibited by the police during the interrogation, and any other factors which may serve to drain one's powers of resistance to suggestion and coercion. *DeJesus*, 567 Pa. at 429–30, 787 A.2d at 402–03. On appeal, this Court will reverse the suppression court's determination in this regard only where it finds an error of law or finding of fact without record support. *Id.* 567 Pa. at 427–28, 787 A.2d at 401.

In its opinion denying suppression of the statement, the trial court concluded that Appellant voluntarily waived his Miranda rights. The court observed, *inter alia*, that the officers informed Appellant that they wanted to question him regarding Leibig's death, and Appellant orally agreed to give a statement. Moreover, it noted, although initially refusing to "sign" a waiver form, he subsequently reconsidered and signed the waiver, giving a detailed statement as to his version of events. The court further pointed to the absence of any

interest therein. Given our resolution of his suppression claim, we need not reach this issue.

evidence that the officers threatened or promised Appellant anything in return for his statement, and noted that, when he became frustrated with the interview, Appellant terminated it by invoking his privilege against self-incrimination.

In a terse, single paragraph argument, Appellant submits without citation to supporting legal authority, that the mere fact that he initially indicated he would not "sign" anything renders his subsequent waiver of his Miranda rights invalid. He baldly asserts that "after 20 minutes of constant and persistent questioning by two police officers[,] that [his] will was overborne to such a degree that he involuntarily signed the waiver form." Appellant's Brief at 43.

The Commonwealth, to the contrary, contends that the evidence demonstrates Appellant gave lengthy and careful consideration to his decision to waive his Miranda rights. It notes, *inter alia,* that he was advised of his rights, and that Appellant's prior experience with law enforcement indicates his understanding of the Miranda procedure, that there was no evidence that he was ill, inebriated, upset or mistreated during the interview, and that there was no evidence he was threatened or promised anything in exchange for his testimony.

We find no basis to disturb the lower court's decision. Contrary to Appellant's suggestion, the record does not indicate that Appellant initially sought to invoke his rights, and then relented only in response to "constant and persistent questioning." *Id.* Rather, the testimony at the suppression hearing demonstrated that, while Appellant was initially reluctant to sign a waiver because of prior perceived problems with the police, upon being advised that such a waiver was necessary if he wished to talk about Leibig's death, he continued expressing his distrust of the police, but, ultimately, changed his mind and decided to sign the waiver. As the trial court noted, there was no evidence that Appellant was threatened or promised anything with respect to his statement, no evidence he was in a particularly vulnerable state at the time he offered the statement, and no evidence that the method or length of the interview was particularly likely to overbear his will.

116

Moreover, as the trial court opined, Appellant repeatedly indicated he understood his Miranda rights and their significance, and, when he wished to end the interview, invoked his right to do so. We can discern no basis to reverse the trial court's determination that he voluntarily waived his Miranda rights.

## D. Weight of the Evidence

 In his fourth issue, Appellant contends that the trial court erred in denying his post-sentence motion for a new trial on the ground the verdict was against the weight of the evidence because Leibig's fingernails did not contain his DNA. A weight of the evidence claim concedes that the evidence is sufficient to sustain the verdict, but seeks a new trial on the ground that the evidence was so one-sided or so weighted in favor of acquittal that a guilty verdict shocks one's sense of justice. *Commonwealth v. Widmer*, 560 Pa. 308, 318–20, 744 A.2d 745, 751–52 (2000); *Commonwealth v. Champney*, 574 Pa. 435, 443–44, 832 A.2d 403, 408–09 (2003). On review, an appellate court does not substitute its judgment for the finder of fact and consider the underlying question of whether the verdict is against the weight of the evidence, but, rather, determines only whether the trial court abused its discretion in making its determination. *Widmer*, 560 Pa. at 321–22, 744 A.2d at 753; *Champney*, 574 Pa. at 444, 832 A.2d at 408.

 In its Pa.R.A.P. 1925(a) opinion, the trial court opined that the verdict did not shock its sense of justice. Noting that there was no basis to conclude that Leibig had actually scratched her assailant, that Dr. Hoffman testified that Leibig had short nails that rendered it difficult for her to do so, and that the bulk of the remaining evidence inculpated Appellant, the court rejected Appellant's claim.

On appeal, Appellant essentially reasserts the claim he made before the trial court. He notes that the Commonwealth did not offer Leibig's fingernail clippings for DNA testing and further notes that Dr. Hoffman admitted it was possible that Leibig could have scratched her attacker, thereby obtaining his DNA. Based on this evidence, he asserts,

there was a reasonable doubt as to whether he, and not some identified third party, attacked Leibig and left DNA under her fingernails.[11]

Based upon our review of the record, we cannot say that the trial court's decision was an abuse of discretion. As the trial court noted, while Dr. Hoffman indicated the possibility that Leibig might have scratched her assailant, he also noted that her short fingernails likely precluded her from obtaining her attacker's DNA. Moreover, as the trial court observed, the Commonwealth produced substantial other forensic and testimonial evidence that Appellant committed the crime, as discussed above. Thus, Appellant offers no reason, and we discern none, that the trial court's decision constituted an abuse of discretion.

## E. After–Discovered Evidence

Appellant next argues that the trial court erred in denying his post-sentence motion for a new trial on the ground of after-discovered evidence that Grube admitted to Rittenhouse that he and Appellant had attempted to rob Leibig and that, after Appellant killed her, Grube assisted in getting rid of evidence of the crime. A trial court should grant a motion for new trial on the ground of after-discovered evidence where producible and admissible evidence discovered after trial (1) could not have been obtained prior to the end of trial with the exercise of reasonable diligence; (2) is not merely corroborative or cumulative evidence; (3) is not merely impeachment evidence; and (4) is of such a nature that its use will likely result in a different verdict on retrial. *Commonwealth v. Chamberlain*, 612 Pa. 107, 163–64, 30 A.3d 381, 414 (2011). In reviewing the trial court's determination in this regard, this Court affirms unless the determination constitutes an abuse of discretion. *Id.* at 166, 30 A.3d at 416.

In its opinion disposing of Appellant's post-sentence motion, the trial court rejected Appellant's claim of after-discovered evidence on multiple grounds. The court opined, *inter alia,*

11. In its brief, the Commonwealth relies on the trial court's disposition of this claim.

that Appellant failed to demonstrate why he could not have obtained Rittenhouse's testimony prior to trial, noting that he knew of her identity at that time but failed to question her until she unilaterally came forward. In any event, the court found that, in light of the myriad evidence against Appellant and Rittenhouse's bias and lack of reliability, Rittenhouse's testimony would not likely prompt a different verdict upon retrial.[12]

Appellant argues the trial court erred in denying his motion for a new trial because Rittenhouse's statements met each of the conditions set forth *supra*. First, on the issue of due diligence, he contends that he was not required to seek the statements because Rittenhouse had not yet disclosed them to police. He submits his case is analogous to *Commonwealth v. Brosnick*, 530 Pa. 158, 162–66, 607 A.2d 725, 726–29 (1992) (holding that Auditor General's report of widespread breathalyzer failure was not discoverable by defendant in exercise of due diligence because the notion that the defendant was required to conduct a comprehensive study of breathalyzers in the Commonwealth was "ludicrous" and "beyond what is reasonably expected"); he also claims that it would be ludicrous to expect him to question a witness who was determined not to speak at all regarding Grube's statements. Appellant further argues the statements were not merely corroborative or cumulative evidence because they present a potentially new theory of the events in question, and submits that they would not be used for the sole purpose of impeaching Grube. As to the statements' likely effect on the verdict, Appellant asserts that, because the Commonwealth did not impeach Rittenhouse at the hearing on his post-sentence motion, and because Grube himself had been dishonest with police in the past, Appellant would likely be acquitted on retrial.

The Commonwealth contends, consistent with the trial court's analysis, that Rittenhouse's statements fail to meet

12. The trial court also found the evidence was merely corroborative, cumulative evidence that would be used solely to impeach Justin Grube, still implicated Appellant in the murder, and directly contradicted his testimony and statement that a yellow-hooded man attacked him and killed Leibig.

each requirement for a new trial on the basis of after-discovered evidence. It notes, as did the trial court, that the defense knew of Rittenhouse's identity, but merely failed to question her or call her as a witness. It also summarily argues that the testimony would merely be used to impeach Grube's testimony, and that the admission of the evidence upon retrial would not warrant a different verdict.

■ Whether or not Rittenhouse's account of Grube's statements was reasonably discoverable with due diligence, and whether or not Rittenhouse's account was corroborative, cumulative, or impeachment evidence, we agree with trial court's determination that they likely would not have prompted a different verdict on retrial. Notably, in his brief, Appellant merely argues that discrediting Grube would have led to his acquittal. Not only does that contention ignore the trial court's reasoned analysis that, even if believed, Rittenhouse's testimony as to Grube's hearsay statements still inculpated Appellant in first-degree murder by means of torture, but it also fails to acknowledge the significance of the other evidence against him. Given the overwhelming remainder of the evidence inculpating Appellant, which we discussed above, and the relatively minor probative force of Grube's testimony in demonstrating Appellant's guilt, we discern no abuse of discretion in the trial court's determination that Rittenhouse's statements would not have led to a different verdict. Consequently, Appellant is not entitled to a new trial.

### F. Motion to Exclude Photographs

■ Next, Appellant challenges the trial court's ruling denying his motion *in limine* to exclude photographs of the crime scene and Leibig's autopsy on the ground that their probative value was outweighed by their risk of unfair prejudice. Where a photograph "possesses gruesome or inflammatory qualities likely to inflame the passions of the viewer" a trial court must not merely exclude them based on those qualities, but must determine whether their "essential evidentiary value ... clearly outweighs the likelihood of inflaming the minds and passions of the jurors." *Commonwealth v.*

*Schroth,* 479 Pa. 485, 488–89, 388 A.2d 1034, 1036–37 (1978); *cf.* Pa.R.E. 403. A trial court's determination in that regard must be affirmed unless the trial court has abused its discretion. *Id.* at 488, 388 A.2d at 1036.

In its Pa.R.A.P. 1925(a) opinion, the trial court rejected Appellant's claim, observing that, upon examining color versions of the assertedly prejudicial photographs, it excluded two of the photographs and determined that several would be too prejudicial in color format; consequently, it allowed presentation of black and white counterparts, which it found were not so prejudicial as to outweigh their probative value.

In a two-paragraph analysis, Appellant recites the appropriate standard of review, notes that he requested the exclusion of 14 photographs of the crime scene and Leibig's autopsy, and asserts that the bloody nature of the photographs likely "inflame[d] the jury." Appellant's Brief at 54. He suggests "testimony of the officers that discovered and processed the crime scene would have been enough" to communicate the photographs' content to the jury. *Id.*

The Commonwealth notes that the challenged photographs were necessary to, *inter alia,* a full explanation of Leibig's wounds and the blood stain patterns at the scene of the crime, both central to matters in this case, and contends that the trial court did not abuse its discretion in deeming their probative value greater than their risk of prejudice. The Commonwealth notes that, as we held in *Commonwealth v. Tharp,* 574 Pa. 202, 223, 830 A.2d 519, 531 (2003),

> A criminal homicide trial is, by its very nature, unpleasant, and the photographic images of the injuries inflicted are merely consonant with the brutality of the subject of inquiry. To permit the disturbing nature of the images of the victim to rule the question of admissibility would result in exclusion of all photographs of the homicide victim, and would defeat one of the essential functions of a criminal trial, inquiry into the intent of the actor. There is no need to so overextend an attempt to sanitize the evidence of the condition of the body as to deprive the Commonwealth of

opportunities of proof in support of the onerous burden of proof beyond a reasonable doubt.

*Id.* (quoting *Commonwealth v. McCutchen,* 499 Pa. 597, 602, 454 A.2d 547, 549 (1982)).

██ Having reviewed the record and the photographs at issue, we discern no abuse of discretion in the trial court's determination. Notably, Appellant does not provide any significant analysis of the nature of the assertedly prejudicial photographs or of their probative value. As the trial court and the Commonwealth indicate, the challenged photographs were highly relevant to the nature of the attack, which in turn was relevant to the issues of intent, identity, and torture, as well as to the jury's understanding of witness testimony regarding those issues. In making its determination on their admissibility, the trial court weighed this significant probative value against the likelihood of unfairly prejudicing the jury against the defendant. Excluding two of the photographs, it nevertheless concluded that, if published only in black and white format, the remainder had a greater essential evidentiary value than risk of unfair prejudice to the jury. Moreover, we also note that the trial court directly admonished the jury to avoid permitting the photographs to prejudice them against the defendant. *See* N.T., 5/31/2011–6/2/2011, at 369–70. Appellant offers no evidence that the jury disregarded these instructions. *See Commonwealth v. O'Hannon,* 557 Pa. 256, 262, 732 A.2d 1193, 1196 (1999) ("Absent evidence to the contrary, the jury is presumed to have followed the trial court's instructions."). Thus, we discern no basis for relief on this claim.

### G. Sufficiency of the Evidence to Establish Aggravating Factor of Torture

██ Finally, Appellant contends that the evidence presented at trial was insufficient to establish the aggravating factor of torture because the evidence established neither the exact duration of Leibig's attack nor the order in which she sustained her wounds. To establish that a murder was committed by means of torture:

[T]he Commonwealth must show that the defendant intentionally inflicted ... a considerable amount of pain and suffering that was unnecessarily heinous, atrocious, or cruel, manifesting exceptional depravity. Implicit ... is the requirement of an intent to cause pain and suffering in addition to the intent to kill. The intent to torture may be proven from the circumstances surrounding the killing. This Court has listed factors to be considered ... including, but not limited to: (1) the manner in which the murder was accomplished, including the number and type of wounds inflicted; (2) whether the wounds were inflicted on a vital or non-vital area of the body; (3) whether the victim was conscious when the wounds were received; and (4) the duration of the episode. In reviewing a jury's finding of torture, this Court examines the evidence in the light most favorable to the Commonwealth, and draws all reasonable inferences in its favor.

*Commonwealth v. Spell,* 611 Pa. 584, 596–98, 28 A.3d 1274, 1282–83 (2011) (quoting *Commonwealth v. Montalvo,* 604 Pa. 386, 986 A.2d 84). In reviewing a jury's determination on this question, this Court assesses whether, based on the evidence adduced at trial and reasonable inferences therefrom, a reasonable jury could come to the conclusion that the murder was accomplished by means of torture. *Commonwealth v. Montalvo,* 604 Pa. 386, 429–30, 986 A.2d 84, 109–10 (2009).

The trial court found the evidence adduced at trial amply supported the jury's determination. Citing, *inter alia, Montalvo, supra* (finding sufficient evidence of torture where the victim suffered several nonfatal wounds and was conscious throughout a several-hour attack), the trial court observed that Dr. Hoffman testified that Leibig was stabbed some 30 times, incurring various fatal and nonfatal wounds, and that her defensive wounds and lack of nervous system injury indicated she was conscious and struggled throughout the attack.

 In a terse, four-paragraph analysis, Appellant merely cites to the *Spell* factors, notes that Dr. Hoffman did not testify to the exact duration of Leibig's attack or the order in

which she sustained her wounds, and asserts that the evidence was insufficient to demonstrate torture because "it cannot be said with certainty how much pain the victim felt as the order of the wounds is not established." Appellant's Brief at 55.[13]

The Commonwealth contends, consistent with the trial court's analysis, that Dr. Hoffman's testimony supports the jury's determination because it demonstrates Leibig was alive and conscious as Appellant inflicted some 30 fatal and nonfatal stab wounds upon her body. It further observes that Robert Bonczek, based on his analysis of the blood patterns in the car, corroborated the view that Leibig struggled throughout her attack.

In *Montalvo*, we affirmed a jury's determination that the appellant committed murder by means of torture where the Commonwealth presented medical testimony establishing, *inter alia*, that she may have been conscious while sustaining four blows to the head, three nonfatal knife wounds to the neck, and severance of her jugular vein and carotid artery. *Montalvo*, 604 Pa. at 429, 986 A.2d at 109–10. Subsequently, and by contrast, in *Spell*, we revisited that question where the jury's inference of torture relied not on evidence, but rather on mere speculation, and held the Commonwealth's claim that, because the victim had gone missing for 24 hours, she might have been subjected to a lengthy and protracted attack, was insufficient to demonstrate torture. 611 Pa. at 596–98, 28 A.2d at 1282–84. In so holding, we observed that the Commonwealth could not merely offer theories about the execution of the crime, and noted the complete absence of evidence tending to demonstrate torture. *Id.* After reciting the factors set forth *supra*, we noted there was no evidence of the length of the victim's attack, suggesting she was subjected to a prolonged assault, and no medical evidence, or evidence of the order of her wounds, tending to show she was alive and

13. To the extent Appellant couches his argument in terms of the actual pain experienced during his assault, we note that the inquiry does not center on the actual pain and suffering of a victim, but rather on whether the assailant employed means demonstrating an intent to cause pain and suffering. *See Commonwealth v. Thomas*, 522 Pa. 256, 277–78, 561 A.2d 699, 709–10 (1989).

124

conscious throughout her attack, and suggesting that she suffered throughout its execution. 611 Pa. at 597, 28 A.2d at 1283. We further indicated that the nature of the crime itself—a beating death—did not compensate for this paucity of evidence. *Id.* Although noting that we have previously affirmed jury determinations of torture where the very nature of a crime demonstrates an intent to inflict pain and suffering in addition to death, we found that the beating itself did not evidence such an intent. *Id.*

In the instant case, we find the evidence amply supported the jury's determination. As in *Montalvo,* and unlike in Spell, the Commonwealth presented significant evidence that Appellant sought to cause Leibig pain and suffering. Dr. Hoffman testified that, based on Leibig's defensive wounds and her lack of heart, brain, or central nervous system injury, she was alive and conscious for the entirety of the 2 to 15 minute attack, during which Appellant inflicted nearly 30 fatal and nonfatal wounds to her face, neck, head, shoulder, and chest, as she bled out in the backseat of her car. Moreover, both Dr. Hoffman and Robert Bonczek testified that, based on blood patterns in the car, Leibig at one point tried to escape her assailant, only to have her face pressed against the vehicle's console. While Appellant correctly notes that there was no evidence as to the exact duration of the attack or the order in which the wounds were inflicted, neither of those inquiries are dispositive, but rather are merely factors worthy of consideration in the general inquiry of whether the assailant had the intent to cause pain and suffering as well as death. *See, e.g., Commonwealth v. Pagan,* 597 Pa. 69, 99–100, 950 A.2d 270, 288–89 (2008) (holding evidence sufficient to support finding of torture where the victim was strangled, stabbed with a knife, and stabbed with an ice pick, and sustained various nonfatal wounds, despite the lack of evidence on the order in which he sustained the wounds, and despite the lack of evidence as to whether the victim was conscious during the attack); *Commonwealth v. Karenbauer,* 552 Pa. 420, 447–48, 715 A.2d 1086, 1098–99 (1998) (holding evidence sufficient to support finding of torture where, instead of using his "prohibi-

tive size advantage and the knife in his possession to [kill the victim] far more expeditiously," he caused 18 nonfatal stab wounds on his conscious victim, including one on her throat, and drowned her thereafter (quoting to trial court opinion denying post-sentence motion)). We conclude the evidence supports the jury's determination that Appellant had such intent, and, consequently, that he committed the murder by means of torture.

## H. Statutory Review of Imposition of Sentence of Death

■ Having addressed and rejected each of Appellant's claims, this Court is obligated to affirm the judgment of sentence unless we determine that its imposition was "the product of passion, prejudice or any other arbitrary factor" or that "the evidence fails to support the finding of at least one aggravating circumstance." 42 Pa.C.S.A. § 9711(h)(3)(i) & (ii). After a thorough and independent review of the record, we conclude that the sentence imposed was not the product of passion, prejudice, or any other arbitrary factor, but rather was the product of the jury's determination that Appellant stabbed Leibig some 30 times and left her to die from exsanguination in the backseat of her car. Furthermore, as noted *supra*, we find that Dr. Hoffman's and Mr. Bonczek's testimony supported the jury's finding of at least one aggravator—that the killing was committed by means of torture. Accordingly, we affirm the convictions and the judgment of sentence of death.[14]

Judgment of sentence affirmed. Jurisdiction relinquished.

Chief Justice CASTILLE and Justices SAYLOR, EAKIN, BAER, McCAFFERY and STEVENS join the opinion.

14. Pursuant to 42 Pa.C.S. § 9711(i), we direct the Prothonotary of the Supreme Court to transmit a complete record of these proceedings to the Governor.