J-S14020-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| SCOT BAILLIE BOWSER | : | |
| | : | |
| Appellant | : | No. 989 WDA 2021 |

Appeal from the Judgment of Sentence Entered June 1, 2021
In the Court of Common Pleas of Armstrong County Criminal Division at
No(s): CP-03-CR-0000945-2018

BEFORE: McLAUGHLIN, J., McCAFFERY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY McCAFFERY, J.:  **FILED: JUNE 27, 2022**

Scot Baillie Bowser (Appellant) appeals from the judgment of sentence entered in the Armstrong County Court of Common Pleas following his jury convictions of two counts of strangulation, and one count each of aggravated assault, simple assault, recklessly endangering another person (REAP), and disorderly conduct.[1]  On appeal, he challenges the weight of the evidence, alleging that the testimony of Paige Carney (Victim) did not support the jury's verdict.  We affirm.

This matter stems from Appellant's physical assault of Victim, his then girlfriend, in their home on November 16, 2018.  Appellant was subsequently

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 2718(a)(1), 2702(a)(1), 2701(a)(1), 2705, and 5503(a)(1), respectively.

charged with three counts of strangulation and one count each of aggravated assault, simple assault, REAP, disorderly conduct, and harassment.[2] This case proceeded to a jury trial commencing on April 13, 2021.[3]

At trial, Victim testified that on the day of the incident, she woke up "around" 2:00 p.m. at the home she lived in with Appellant and Appellant's mother in Ford City, Armstrong County, Pennsylvania. N.T., 4/13/21-4/14/21, at 6-7. Victim and Appellant began to have a verbal argument when Appellant became angry and "punched [Victim] in the back." *Id.* at 7-8. Victim stated that the altercation turned "into a full-fledged . . . fight" where she lost consciousness "[t]hree times." *Id.* at 8, 14-15. At the start of the altercation, Appellant was "grabbing [Victim] and bashing [her] head off the dresser and into [his] bed frame[.]" *Id.* at 8. Victim did not fight back, but instead "ragdolled" and "went limp" because she "didn't know what to do." *Id.* at 8, 10.

When Victim awoke, Appellant had her "restrained" on his bed. *Id.* at 11, 59-60. She began "screaming hoping [Appellant's] mom would come downstairs" and intervene. Appellant then "yanked [her lower jaw] hard and shoved a . . . sock down [her] throat so [she] couldn't breathe[.]"[4] *Id.* at 12,

---

[2] 18 Pa.C.S. § 2709(a)(1).

[3] Both days of trial are recorded in one transcript in succession.

[4] Victim's testimony also described Appellant putting "his hands around [her] throat" before putting the sock in her mouth, but she did not state clearly
*(Footnote Continued Next Page)*

- 2 -

61-62. She then passed out again. *Id.*at 12, 62. Victim woke to Appellant "burning [her] with a cigarette[,]" which left a scar on her leg. N.T. at 12-13. When Appellant got off of her and looked away, Victim "tried running[,]" but Appellant "came up behind [her] and he lifted [her] in the air around [her] neck[,]" choking her. *Id.* at 14, 63-64. Victim testified she "thought [she] was going to die and . . . completely passed out" again. *Id.* at 14. This time, she awoke in the hallway outside of the bedroom. *Id.* at 17. She then "got up and . . . ran out the front door." *Id.*

Victim testified she went to her grandfather's house, which was nearby, where she saw her grandfather and her uncle, Jimmy Jack. *Id.* at 17-19, 65. She was "completely hysterical" as she told her grandfather and Jack what happened. *Id.* at 19. She testified Jack, who was "very good friends with" Appellant, "didn't believe" her, and her grandfather simply told her to go to the hospital. *Id.* at 19-20. Victim became frustrated, left, and walked to the home of her friend, Bonnie Walters, who lived about "a block away." *Id.* at 21. She stated she arrived at Walters' home about 30 to 45 minutes after escaping the assault. *Id.* at 22. Walters helped get Victim to the hospital. *Id.* The hospital then contacted the police. *Id.* at 24.

After the attack, Victim explained that she "gave up" — she was "on drugs and . . . didn't want to live anymore." N.T. at 30. During this time, she

---

beyond that when this happened. *See* N.T. at 15, 59-61. The jury ultimately acquitted Appellant of the strangulation charge involving "two hand choking [of a] family or household member[.]" *See* Verdict Sheet, 4/14/21, at 1.

contacted Appellant's mother via Facebook Messenger. ***Id.*** at 31. Victim testified she "was scared . . . and didn't want to deal with it anymore[,]" so she asked Appellant's mother to pay her $200 "to not pursue charges" against Appellant. ***Id.*** at 31, 34. Appellant's mother agreed, but ultimately Victim decided to pursue the case against Appellant. ***Id.*** at 34-37. By the time of trial, Victim had not taken drugs for over a year. ***Id.*** at 41.

Walters testified that on the day of the incident, she was unsure what time Victim arrived at her home, but that it was "no later than 7:00" p.m. N.T. at 113, 124. Walters stated Victim was "distraught" and had bruises on her neck and arms. ***Id.*** at 114. Victim told Walters that Appellant "brutally attacked her." ***Id.*** at 115. Walters helped Victim get to the hospital "[a]bout an hour" later. ***Id.*** at 115-16.

Appellant presented the testimony of his mother and Victim's uncle, Jack. Appellant did not testify at trial. Appellant's mother testified that Victim asked for $200 in exchange for not pursuing charges against Appellant. N.T. at 186. Appellant's mother initially agreed to pay Victim $200, but ultimately did not give her the money. ***Id.*** at 196-97.

Jack testified that on the day of the incident Appellant called him "before noon" because he was "concerned" about Victim's "well-being." N.T. at 211. Jack stated Victim arrived at his home "five to ten minutes" after the phone call and was crying as she recounted the attack to Jack. ***Id.*** at 212, 214. Jack testified that he asked to see the marks on her body, but he saw nothing. ***Id.***

at 214. He eventually agreed to take her to the hospital, but she left "in a car" while he retrieved his keys. *Id.* at 214-15.[5]

On April 14, 2021, the jury convicted Appellant of two counts of strangulation and one count each of aggravated assault, simple assault, REAP, and disorderly conduct; the jury found Appellant not guilty of the remaining strangulation charge, and the trial court later dismissed the harassment charge. On June 1, 2021, the trial court sentenced Appellant to 60 to 120 months' incarceration for aggravated assault and imposed no further penalty for the remaining charges.

Appellant filed a timely post-sentence motion, challenging the weight of the evidence supporting his conviction. The trial court denied the motion on August 6, 2021, and this timely appeal followed.[6]

Appellant raises the following claim for our review:

> Did the trial court err in denying [Appellant's] Post-Sentence Motion seeking a new trial on the basis that the evidence presented by the Commonwealth at trial was insufficient to sustain the verdict due to the fact that the verdict rendered was contrary to the weight of the evidence in that said evidence was so contrary to the verdict that it shocks one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail?

Appellant's Brief at 7.

_____

[5] Jack acknowledged he has a prior conviction for retail theft. N.T. at 218.

[6] Appellant complied with the trial court's order to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).

Appellant argues the verdict was against the weight of the evidence because Victim's testimony was "uncorroborated" and "so weak" that it cannot support the verdict. Appellant's Brief at 15. Appellant maintains that Victim's testimony contradicts the testimony of Jack and Walters, leaving a "gap in time of approximately four hours" between her leaving her home following the assault and her arrival at the hospital. *Id.* at 17. Appellant avers the "glaring inconsistencies" between the testimony of the witnesses and Victim renders the verdict against the weight of the evidence. *Id.* at 17-18. Appellant emphasizes that Jack did not observe any marks on Victim, and during that gap in time "any number of scenarios could have occurred causing the injuries observed by Ms. Walters" and the treating physician. *Id.* at 16, 18. He also insists that Victim's attempted arrangement to accept $200 in exchange for withdrawing her allegations "renders her testimony . . . so unreliable" that it "shock[s] one's sense of justice." *Id.* at 13. We conclude no relief is due.

Preliminarily, we note that while Appellant claims the evidence was "insufficient to sustain the verdict" in his statement of questions presented, his argument focuses solely on the weight of the evidence supporting his conviction. *See* Appellant's Brief at 7; *see also id.* at 12-18. To the extent Appellant intended to raise a sufficiency challenge, we agree with the trial court that such issue is waived. *See* Trial Ct. Op., 9/22/21, at 5 (unpaginated) (sufficiency argument waived when Appellant failed to "identify the specific elements of any crime the Commonwealth failed to establish"); *see also Commonwealth v. Gibbs*, 981 A.2d 274, 281 (finding a challenge to

sufficiency of the evidence waived where the appellant did not specify which conviction he was challenging, did not argue which elements were not met, and cited no legal authority).

This Court's standard of review of a weight of the evidence claim is well-settled:[7]

> A weight of the evidence claim concedes that the evidence is sufficient to sustain the verdict, but seeks a new trial on the ground that the evidence was so one-sided or so weighted in favor of acquittal that a guilty verdict shocks one's sense of justice. On review, an appellate court does not substitute its judgment for the finder of fact and consider the underlying question of whether the verdict is against the weight of the evidence, but, rather, determines only whether the trial court abused its discretion in making its determination.

***Commonwealth v. Lyons***, 79 A.3d 1053, 1067 (Pa. 2013) (citations omitted). A trial court will not grant a new trial because of a mere conflict in the testimony. ***See Commonwealth v. Mucci***, 143 A.3d 399, 410 (Pa. Super. 2016) (citation omitted). Further, the jury, as fact finder, is free to believe all, some, or none or the evidence presented. ***Commonwealth v. Jacoby***, 170 A.3d 1065, 1078 (Pa. 2017) (citations omitted). The jury is also free to "resolve any inconsistencies or discrepancies in the testimony in either party's favor." ***Id.***

---

[7] Appellant properly preserved his weight claim in his post-sentence motion pursuant to Pa.R.Crim.P. 607. ***See*** Pa.R.Crim.P. 607 (parties must raise a challenge to the weight of the evidence before the trial court either before sentencing or in a post-sentence motion); ***see also*** Appellant's Post-Sentence Motion, 6/10/21, at 2 (unpaginated).

This Court will not find an abuse of discretion

based on a mere error of judgment, but rather . . . where the [trial] court has reached a conclusion which overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will. Importantly, [this C]ourt should not find that a trial court abused its discretion merely because [we] disagree[ ] with the trial court's conclusion. Indeed, "when reviewing the trial court's exercise of discretion, it is improper for [this C]ourt to 'step[ ] into the shoes' of the trial judge and review the evidence *de novo*." In other words, [this C]ourt "may not disturb a trial court's discretionary ruling by substituting its own judgment for that of the trial court."

***Commonwealth v. Gill***, 206 A.3d 459, 467 (Pa. 2019) (citations and some quotation marks omitted).

The trial court found that despite the alleged inconsistencies between Victim and Jack's testimony, the record supported the jury's verdict. Trial Ct. Op. at 6-8 (unpaginated). The trial court opined:

[Appellant] identifies only two conflicting aspects of [Victim]'s and Jack's testimony: that Jack did not observe any evidence of injuries on [Victim]'s body and that Jack testified that [Victim] left his residence in a car and not on foot[.] The record is far from clear regarding the extent of Jack's examination of Carney when she arrived, and much of the physical evidence of the assault likely was under her clothes. It is also possible, if not likely, that the petechial[8] rash on [Victim]'s face did not develop fully until after she left Jack's residence.

There does appear to be an inconsistency in the testimony concerning how [Victim] left Jack's residence, but such a fact is immaterial to what occurred prior to [her] arrival.

_____

[8] The treating physician on the day of the assault, Dr. Roderick Groomes, M.D., testified that Victim had a petechial rash, which is a "classic rash for strangulation" and supported Victim's assertion that she was "choked until she lost consciousness[.]" N.T. at 88-89, 99.

- 8 -

*Id.* at 6-7 (unpaginated) (paragraph break inserted). The trial court noted that the jury was free to assess the witnesses' credibility and resolve conflicts in testimony however it saw fit. *Id.* at 7. We agree. *See Jacoby*, 170 A.3d at 1078. Victim testified that Appellant attacked her by punching her, slamming her into furniture, burning her with a cigarette, and cutting off her air supply to the point that she lost consciousness. The jury credited this testimony despite slight inconsistencies between the witnesses regarding the timing of the events. We cannot reverse the verdict based on Appellant's claim that the jury should have credited an account of the incident that favors him over Victim. *See Mucci*, 143 A.3d at 410.

Appellant also challenges Victim's credibility based upon the Facebook messages between Victim and Appellant's mother. The trial court noted that "the communications [between Victim and Appellant's mother] are undisputed in the record." Trial Ct. Op. at 7 (unpaginated). Nevertheless, it found:

> Although [Victim's] attempt to get money in exchange for her non-cooperation with the Commonwealth was inappropriate, [Victim] at no time told [Appellant's mother] that the incident didn't occur or that she would lie in the trial. Rather, [Victim]'s statements to hospital staff, the police, [her grandfather,] and . . . Jack all were consistent with one another and with [her] testimony at trial. . . .

*Id.* The trial court concluded, and we agree, that Victim's Facebook messages with Appellant's mother did not render her testimony as a whole "unreliable, inconsistent, and untrustworthy" to the point where the jury's verdict would shock one's sense of justice. *See id.* at 8; *see also Lyons*, 79 A.3d at 1067. An offer to circumvent prosecution of a crime in exchange for monetary

- 9 -

compensation is inappropriate, but Victim's account of the physical assault is uncontradicted. Further, she explained in her testimony why she contacted Appellant's mother, and the jury did not find this incident discredited her description of the attack. **See Jacoby**, 170 A.3d at 1078.

Appellant failed to demonstrate how the trial court abused its discretion in denying his claim. Thus, no relief is due. **See Lyons**, 79 A.3d at 1067.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 6/27/2022