J-A04035-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| ISAIAH HEREFORD, | |
| Appellant | No. 232 WDA 2015 |

Appeal from the Judgment of Sentence December 15, 2014
In the Court of Common Pleas of Allegheny  County
Criminal Division at No(s): CP-02-CR-0010538-2010

BEFORE:  FORD ELLIOTT, P.J.E., BENDER, P.J.E., and SHOGAN, J.

MEMORANDUM BY SHOGAN, J.:                          **FILED MAY 3, 2016**

Appellant, Isaiah Hereford, appeals from the judgment of sentence entered following his convictions of three counts of second-degree murder, two counts of aggravated assault, and one count each of robbery, burglary, and conspiracy to commit robbery, all relating to his participation in a home invasion in McKeesport, Pennsylvania.  We affirm.

The trial court summarized the tragic facts of this case as follows:

[T]he evidence presented at trial established that on the evening of June 14, 2010, Brittany Poindexter went to her brother's apartment in the Crawford Village housing complex in the McKeesport area for what turned out to be a surprise 18th birthday party.  The party went on for several hours, with both family and friends present, and eventually guests began to leave.  By the early morning hours of June 15, 2010, only five (5) people were left: Brittany, her brother Jahard, Jahard's boyfriend/roommate Marcus Madden, Brittany's boyfriend Tre Madden and their friend, Angela Sanders.  Shortly after 1:00 a.m., someone knocked on the screen door of the apartment; it

was generally presumed that the person was there to buy a cigarette, since Jahard and Marcus sold cigarettes and marijuana out of the apartment. Marcus got up to open the door and when he did, two (2) men entered holding guns. The men told everyone to "get down" and asked "where's the money?" When Jahard got up to get the money, the men started shooting. Jahard Poindexter, Tre Madden and Angela Sanders were killed in the gunfire and Marcus Madden was shot and injured.[1] At trial, Marcus Madden identified [Appellant] as the first man who entered the apartment with a gun and one of the shooters.

Trial Court Opinion, 5/20/15, at 3. The trial court set forth the procedural history of this case as follows:

[Appellant] was charged with Criminal Homicide, Criminal Attempt, Aggravated Assault, Robbery, Burglary, Carrying a Firearm Without a License, Possession of a Firearm by a Minor, Criminal Conspiracy and Recklessly Endangering Another Person (["]REAP["]) in relation to [the] events that occurred [on June 14, 2010,] when he was 17 years old. Prior to trial, the REAP counts were withdrawn. A jury trial was subsequently held before this Court from August 1-4, 2011. Following the close of the Commonwealth's case, this Court granted [Appellant's] Motion for Judgment of Acquittal at the Possession of a Firearm by a Minor charge. At the conclusion of the trial, [Appellant] was convicted of [three counts of second-degree murder, two counts of aggravated assault, and one count each of robbery, burglary, and conspiracy to commit robbery].

On November 1, 2011, [Appellant] appeared before this Court and was sentenced to three (3) concurrent terms of life imprisonment, plus two (2) additional concurrent terms of imprisonment of five (5) to ten (10) years. [Appellant filed post-sentence motions, which were denied] and a direct appeal was taken. Thereafter, [Appellant] filed a timely Concise Statement

_____

[1] More specifically, Jahard Poindexter was shot three times, Tre Madden was shot eleven times, and Angela Sanders was shot six times. Marcus Madden suffered a wound to his head. Brittany Poindexter was uninjured and immediately telephoned 911.

of Matters Complained of on Appeal at this Court's direction, raising sufficiency, weight of the evidence, evidentiary and decertification issues. However, while this Court's review was pending, the United States Supreme Court issued its decision in Miller v. Alabama, 132 S.Ct. 2455 (US. 2012), holding that mandatory life sentences without the possibility of parole were illegal for those offenders who committed their crime prior to the age of 18. In light of Miller, this Court conceded that [Appellant] should be re-sentenced, and by Order of the Superior Court dated June 4, 2013, the judgment of sentence was vacated and the case was remanded for resentencing.

The proscribed [sic] re-sentencing hearing was held before this Court on December 15, 2014, at which time [Appellant] was sentenced to three (3) consecutive terms of imprisonment of 15 years to life, for an aggregate total of 45 years to life. Timely Post-Sentence Motions were filed and were denied on January 7, 2015. This appeal followed.

*Id*. at 1-2 (footnotes omitted). Both Appellant and the trial court have complied with Pa.R.A.P. 1925.

Appellant presents the following issue for our review:

1. Whether Appellant is entitled to an evidentiary hearing and/or new trial when there was after-discovered evidence of Gina Simmons who was willing to testify that she saw the Appellant in a time and place that could have made it impossible for the Appellant to have committed the crime?

Appellant's Brief at 6.

In his sole issue on appeal, Appellant argues that he is entitled to a new trial based upon after-discovered evidence that was not available before trial and could not have been obtained prior to trial by the exercise of due diligence. Appellant's Brief at 15-23. Specifically, Appellant contends that Ms. Gina Simmons, who is a neighbor of Appellant's girlfriend and allegedly has no bias in this case, would testify that after she heard gunshots she

- 3 -

looked out of her window and saw two men running from the area of crime and that Appellant was not one of the two men. Appellant claims that Ms. Simmons would testify that she saw Appellant on his girlfriend's porch approximately fifteen minutes after the incident.

We review a trial court's decision to deny or grant a motion for new trial on the basis of after-discovered evidence for an abuse of discretion. *Commonwealth v. Lyons*, 79 A.3d 1053, 1068 (Pa. 2013). Discretion is abused when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will. *Commonwealth v. Martinez*, 917 A.2d 856, 859 (Pa. Super. 2007) (quoting *Commonwealth v. Widmer*, 744 A.2d 745, 753 (Pa. 2000)).

Our Supreme Court has explained that a motion for a new trial should be granted when the after-discovered evidence is producible, admissible, and the following four-prong test is met:

> [the evidence] (1) could not have been obtained prior to the end of trial with the exercise of reasonable diligence; (2) is not merely corroborative or cumulative evidence; (3) is not merely impeachment evidence; and (4) is of such a nature that its use will likely result in a different verdict on retrial.

*Lyons*, 79 A.3d at 1068. A defendant must establish by a preponderance of the evidence that each of these prongs has been met in order to be entitled

to a new trial. ***Commonwealth v. Padillas***, 997 A.2d 356, 363 (Pa. Super. 2010).

Regarding the first prong of the test, we have summarized the following:

> To obtain a new trial based on after-discovered evidence, the petitioner must explain why he could not have produced the evidence in question at or before trial by the exercise of reasonable diligence. A defendant may unearth information that the party with the burden of proof is not required to uncover, so long as such diligence in investigation does not exceed what is reasonably expected. Thus, a defendant has a duty to bring forth any relevant evidence in his behalf. **A defendant cannot claim he has discovered new evidence simply because he had not been expressly told of that evidence. Likewise, a defendant who fails to question or investigate an obvious, available source of information, cannot later claim evidence from that source constitutes newly discovered evidence.** . . . Absent a plausible explanation for the failure to discover the evidence earlier, evidence obtained after trial should not be deemed after-discovered; to allow the defendant to claim information actually or constructively within his knowledge and available to him is after-discovered.

***Padillas***, 997 A.2d at 363-364 (citations and quotation marks omitted) (emphasis added).

A review of Appellant's brief and the certified record reveals that Appellant has failed to meet the aforementioned standard. Specifically, Appellant argues the following:

> In this case, counsel for [Appellant] was unable to have obtained the evidence prior to the conclusion of the trial by exercise of reasonable diligence. Counsel had no idea who Gina Simmons was until after the trial (docket entry 27). The name of Gina Simmons was never part of the trial in this case. Ms. Simmons simply came forward after the trial.

Appellant's Brief at 17. Essentially, Appellant contends that he was not expressly told of the evidence to be provided by Ms. Simmons.

Our review of the certified record reflects Appellant testified at his trial that he was not at the scene of the crime but was with his girlfriend on the front porch of her home at 645 North Grandview Avenue when the incident in question occurred. N.T., 8/1-4/11, at 511-517. In addition, at trial Appellant presented testimony from his girlfriend, Montaeya White, that she and Appellant were together on the porch of her home at 645 North Grandview Avenue when they heard the gunshots of the instant crime. *Id*. at 494-498. Appellant also presented testimony from his girlfriend's foster mother, Tiara Snyder, which indicated that she saw both Appellant and Ms. White on the porch of 645 North Grandview Avenue before the incident (between 11:15 p.m. and 11:30 p.m.) and after the incident (between 1:15 a.m. and 1:20 a.m.). *Id*. at 487-490. In his amended post-sentence motion, Appellant requested a new trial based upon after-discovered evidence in the form of a handwritten statement from Gina Simmons, who resided at 635 North Grandview Avenue. Ms. Simmons's statement indicated that she saw Appellant and Ms. White on the porch of 645 North Grandview Avenue fifteen minutes after the incident. Amended Post-Sentence Motion, 1/31/12 (Docket Entry 32).

Our further review of the record reveals that on November 22, 2010, over eight months prior to trial, Appellant's counsel filed a motion requesting

the trial court to appoint a private investigator to assist in the investigation of the case. Motion to Appoint Private Investigator, 11/22/10 (Docket Entry 7). In an order dated November 22, 2010, and filed on November 29, 2010, the trial court granted Appellant's motion and appointed a licensed private investigator to assist defense counsel in the investigation and evaluation of the case. Order, 11/29/10 (Docket Entry 8). Considering the fact that Appellant had the assistance of a licensed private investigator, and the fact that Ms. Simmons was a neighbor of the house outside of which Appellant alleges he was sitting at the time of the incident, we must conclude that it is reasonable that Ms. Simmons, and the other neighbors in the area, would have been obvious, available targets of investigation and sources of information prior to trial. Appellant has set forth no explanation why he failed to discover this evidence earlier. Accordingly, Appellant fails to meet the first prong of the four-prong test.

Concerning the second prong of the four-prong test, we have stated the following:

> Before a court grants a new trial on the basis of after-discovered evidence, the defendant must also show the alleged after-discovered evidence is not just corroborative or cumulative of the evidence already presented at trial. Whether new evidence is corroborative or cumulative in this context depends on the strength of the other evidence supporting the conviction. New evidence to support a defendant's claim of innocence is less likely to be deemed cumulative if the conviction is based largely on circumstantial evidence. **Where the new evidence, however, supports claims the defendant previously made and litigated at trial, it is probably cumulative or corroborative of the evidence already presented**.

- 7 -

*Padillas*, 997 A.2d at 364-365 (citations omitted) (emphasis added).

In addressing the issue of after-discovered evidence, the trial court focused upon Appellant's failure to satisfy the second prong of the four-part test. In particular, the trial court addressed this issue in depth as follows:

> As it relates specifically to the requirement that the evidence not be merely corroborative or cumulative, "whether new evidence is corroborative or cumulative in this context depends on the strength of the other evidence supporting the conviction... New evidence to support a defendant's claim of innocence is less likely to be deemed cumulative if the conviction is based largely on circumstantial evidence... Where new evidence, however, supports claims the defendant previously made and litigated at trial, it is probably cumulative or corroborative of evidence already presented." [*Padillas*, 997 A.2d] at 364-[36]5.

> At trial, [Appellant] presented an alibi defense. He testified that at the time of the shooting, he was with his girlfriend, Montaeya White, at her residence located at 645 North Grandview in McKeesport:

> > Q. (Mr. Narvin): Do you recall or can you recall what time you arrived back on Grandview Avenue?

> > A. ([Appellant]): The exact time, no, sir.

> > Q. So how long were you on Grandview before something unusual occurred?

> > A. Probably like an hour.

> > Q. If you remember, all right.

> > A. Yeah.

> > Q. Tell the jury what happened.

> > A. I'm sitting on the porch and my girlfriend was sitting on my lap. We was chillin'. It was a nice

- 8 -

summer night when we heard a whole bunch of gunshots.

Q. What did you do then?

A. After we heard the gunshots, I went into the house. She asked me about it, she asked about the gunshots. I told her they was gunshots, she thought they were fireworks. After we heard them, I stepped in the house for a second.

Q. Okay, you did you [sic] see anyone else after that?

A. No, sir.

Q. You didn't see Montaeya [sic], the foster mother?

A. Yeah, after a couple minutes she ran down the steps to make sure we was all there still at the house.

Q. Now when did you leave Grandview Avenue that day?

A. I didn't leave, I stayed the whole entire night.

(T.T. p. 517-[51]8).

In support of his alibi testimony, [Appellant] also presented the testimony of Ms. White and her foster mother, Tiara Snyder:

Q. (Mr. Narvin): When he got back from Crawford Village, what did the two of you do?

A. (Ms. White): We sat on the porch and he rolled his blunt.

Q. What if anything unusual happened after that.

A. I was sitting on his lap rocking back and forth when we heard gunshots. I was like, "are them fire

crackers" he was like "you could tell you're from Duquesne you're stupid, them is gunshots."

Q. How many gunshots did you hear, do you remember?

A. No.

Q. What happened after that?

A. I ran upstairs to Tiara.

Q. What did you say?

A. I was like, "did you hear them gunshots?"

Q. What did Tiara do as a result of that?

A. She was sucking her thumb like she was going to sleep.

Q. She would be in her bedroom?

A. Yes.

Q. And did you leave that room or did you stay in the room?

A. I left.

Q. What happened after that, where did you go?

A. I went back to the porch to sit with [Appellant].

Q. Was anyone else on the porch?

A. No.

Q. [Appellant] was there?

A. Yes, [Appellant].

Q. There was no one else on the porch?

A. No.

Q. When did you next see your step-mom?

A. When she ran down the steps.

Q. How long was it when she ran down the steps since the time you went up the steps to tell her about the gunshots, how much time?

A. I want to say like three minutes.

Q. What did she say to you when she came down the steps?

A. She ain't says nothing. She said, "[Appellant]," he was like "yo."

Q. Now where did you and [Appellant] go after that?

A. We didn't go nowhere.

(T.T. p. 496-[46]8); and

Q. (Mr. Narvin): About what time did you get home that night?

A. (Ms. Snyder): Between 11:15 and 11:20 - 11:30 somewhere around there.

Q. Once you got home, what did you do?

A. I came home and [Appellant] and Montaeya White was sitting on my front porch. I went upstairs, I turned my AC on, and I went back to my bedroom.

Q. When you say [Appellant], you're referring to [Appellant]?

A. Yes.

Q. Once you were asleep, did you sleep throughout the night into the next morning?

A. No.

Q. You didn't? What woke you up?

A. Montaeya White came upstairs and she asked me "Oh my God, did you hear the gunshots outside?" I said, "no, my AC was on."

Q. You didn't hear the gunshots? What did you do after Montaeya came upstairs?

A. I continued to lay on my bed.

Q. Did you hear any words?

A. Somebody kept calling my cell phone and I finally answered it after they repeatedly kept calling. They told me that there was somebody down Crawford Village shot and they was laying on the ground.

Q. What did you do after that?

A. I jumped up, I ran downstairs and Montaeya and [Appellant] was around and they were both sitting on my front porch.

Q. What time was this about that you went downstairs to check on the children?

A. Between 1:15, 1:20 a.m.

Q. Were they both on the porch?

A. Yes.

(T.T. p. 489-[4]90).

[Appellant] has now proffered a "Statement" made by an individual named Gina Simmons in support of his after-discovered evidence claim. The "Statement" states, in its entirety:

- 12 -

STATEMENT

I am Gina Simmons my address is 635 N. Grandview Ave. McK PA 15132 . . . . On the night of the shooting 6/15/2010 around 1 a.m. I heard shots fired. I was in my bedroom I looked out the window. I saw two men running up the hill towards the 41 building. The two men where [sic] doing something with their shirts eithere [sic] taking the [sic] off or putting them on. These men ran pass [sic] the building up the hill. Around 15 min later I went outside to see what was going on at that time I saw [Appellant] and his girlfriend ont [sic] the porch of 645 N. Grandview Ave. I know [Appellant] was not one of these two men because he would have had to crossed my line of sight to get to 645 N. Grandview.

(signed) Gina Simmons
1/26/12

(Statement of Gina Simmons).

Leaving aside any issues relating to time or availability of discovery prior to trial, it is clear from a review of Ms. Simmons' statement that her testimony would only have been corroborative and cumulative of the alibi testimony presented by [Appellant], Ms. White and Ms. Snyder. Because Ms. Simmons' statement only duplicates evidence already presented, [Appellant] failed to satisfy the requirements of an after-discovered evidence claim and so was not entitled to a new trial. Therefore, this Court was well within its discretion in denying [Appellant's] request for a new trial in this regard. This claim must also fail.

Trial Court Opinion, 5/20/15, at 9-13.

We are constrained to agree with the trial court in this regard and likewise conclude that the evidence proffered in Ms. Simmons' statement is cumulative or corroborative of the evidence already presented by three

defense witnesses. Hence, Appellant has failed to satisfy the second prong of the four–prong test.

With regard to the third prong of the test, we have stated the following:

> Further, a defendant seeking a new trial must demonstrate he will not use the alleged after-discovered evidence solely to impeach the credibility of a witness. Whenever a party offers a witness to provide evidence that contradicts other evidence previously given by another witness, it constitutes impeachment. **Where eyewitness identification tied the defendant to the crime charged and the defendant challenged the identification in his trial, third party testimony exculpating the defendant impeaches the eyewitness**.

*Padillas*, 997 A.2d at 365 (citations and quotation marks omitted) (emphasis added).

Here, our review of the record reveals that Marcus Madden was an eyewitness to the crime and positively identified Appellant to police in a photo array after the incident. N.T., 8/1-4/11, at 406-407. Mr. Madden also provided the following account of the incident, including an identification of Appellant, at trial:

Q. Eventually you hear someone at the door?

A. Yes.

Q. Can you explain what the door looks like?

A. It's a big door which was actually opened, then the screen door was locked.

Q. When you heard someone at the door, who went up to answer it?

- 14 -

A. I did.

* * *

Q. Are there lights outside?

A. Yes.

Q. Were they on?

A. Yes.

Q. When you got to the door, who did you see?

A. I saw a person asking me for a cigarette.

Q. Was his face lit up?

A. Yes.

* * *

Q. Did you have any problems seeing his face?

A. No.

Q. Why is that?

A. Because he was standing right in front of me.

Q. Do you know [sic] the person who was standing there in the courtroom?

A. Yes.

Q. And can you point to him and say what he has on?

A. Purple shirt (pointing in the direction of [Appellant].)

      [ASSISTANT DISTRICT ATTORNEY]: I would ask the record to reflect the witness has identified [Appellant].

      THE COURT: The record will so reflect.

Q. Now the screen door was open or locked at this point in time?

A. It was locked.

Q. And what did you do then after he asked for a cigarette?

A. I turned and I asked Jay if there was any more cigarettes, he said yes and handed me one.

Q. And then what did you do?

A. I turned back towards the door to unlock it.

Q. Was he still standing outside the screen door?

A. Yes.

* * *

Q. What did you do then?

A. When I unlocked the door, it was pulled out or snatched open because I didn't touch the door, the only thing I did was unlock the thing.

Q. Did you in any way invite this person in?

A. No.

Q. Did he have permission to be inside the residence?

A. No.

Q. When the door was snatched open, did he have anything or do anything? Explain.

A. When the door was snatched opened, a gun came in before he did.

Q. What gun?

A. The black gun came in before he did.

Q. What did you do when that happened?

A. Well, he was actually coming towards me with a gun and I initially started backing off.  I ended over by my computer next to my little brother.

Q. Were you looking at anything when you were backing up?

A. Yeah.

Q. What?

A. His face.

Q. Why?

A. Because he was screaming and waving a gun around.

Q. What was he screaming?

A. "Get down, where's the money."

Q. Was that screamed out more than once?

A. Yes.

* * *

Q. Did someone else or did anyone else enter the apartment?

A. Yes.

Q. And did they have anything in their hand?

A. Yes, they had a gun in their hand.

Q. Now, could you see this person's face?

A. No.

Q. Why not?

A. Because there was a shirt or something covering his face, all I could see was his eyes.

Q. Did he say anything?

A. No.

Q. Any screaming, anything?

A. Not that I can remember.

Q. You're focusing on the first guy screaming?

A. Right.

Q. Now after he was screaming to "give me the cash, get down, give me the cash," did anyone move?

A. Yes. I actually got down and Jay got up off the couch.

* * *

Q. Now when [Jay] started to go past, what happened then?

A. That's when all hell broke loose, I guess. The screaming got louder and shooting started. Jay was actually pushed against the wall, the last thing I saw right before the shooting started.

Q. Jay was being pushed against the wall?

A. Yes.

Q. And the shooting started?

A. Yes.

N.T., 8/1-4/11, at 373-379.

It is undisputed that Appellant challenged Mr. Madden's eyewitness account of the incident and identification of Appellant on cross-examination. Appellant's Brief at 21. Likewise, in presenting his defense, Appellant offered his own testimony and that of two other people in an effort to

establish that he was not at the scene of the crime. Because Mr. Madden testified at Appellant's trial and identified Appellant as one of the perpetrators, Ms. Simmons's later statement that she saw Appellant at a different location fifteen minutes after the crime, would be used to directly contradict Mr. Madden's trial testimony. Thus, Ms. Simmons's statement impeaches this eyewitness's testimony. Hence, Ms. Simmons's statement, in addition to being cumulative and corroborative of the three defense witnesses already presented, would be offered for impeachment purposes of the eyewitness. For this reason, Appellant has failed to meet the third prong of the four-prong test.

Concerning the fourth prong of the four-prong test, we have stated the following:

> Finally, before granting a new trial, **a court must assess whether the alleged after-discovered evidence is of such nature and character that it would likely compel a different verdict if a new trial is granted**. In making that determination, a court should consider the integrity of the alleged after-discovered evidence, the motive of those offering the evidence, and the overall strength of the evidence supporting the conviction.

**Padillas**, 997 A.2d at 365 (citations omitted) (emphasis added).

Our review of the certified record reflects the alleged after-discovered evidence that is possibly exonerating to Appellant is the portion of Ms. Simmons's statement placing Appellant on his girlfriend's porch fifteen

minutes after the gunshots were heard in the neighborhood.[2, 3] However, Appellant testified at trial and personally declared that it was only a five-minute walk from the scene of the shootings to his girlfriend's home. N.T., 8/1-4/11, at 511. Therefore, testimony reveals that Appellant had ample time to participate in the commission of the crime, take the admitted five-minute walk to his girlfriend's house, and then be observed by Ms. Simmons on the porch of the girlfriend's home fifteen minutes after the crime occurred. Hence, we conclude that this evidence is not of such a nature and character that it would likely compel a different verdict if a new trial had been granted. Consequently, Appellant has also failed to meet the fourth prong of the four-prong test.

Because Appellant cannot satisfy all four factors of the four-prong test, he is not entitled to a new trial based on after-discovered evidence. **_See_**

**_Lyons_**, 79 A.3d at 1068. Accordingly, we conclude that the trial court did

_____

[2] For ease of reference, we reproduce that portion of the statement below:

> Around 15 min later I went outside to see what was going on at that time I saw [Appellant] and his girlfriend ont [sic] the porch of 645 N. Grandview Ave.

Amended Post-Sentence Motion, 1/31/12 (Docket Entry 32).

[3] With regard to the portion of Ms. Simmons's statement indicating that she saw two men running when she looked outside of her window after hearing gunshots, and her belief that neither of the men were Appellant, there is no indication that those two men were the perpetrators of the instant crime. Consequently, we conclude that portion of Ms. Simmons's statement is not exonerating.

not abuse its discretion in denying Appellant's motion for a new trial based upon after-discovered evidence.

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/3/2016