J-S02038-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| DOMINIC ROUNTREE | : | |
| | : | No. 951 EDA 2017 |
| Appellant | | |

Appeal from the Judgment of Sentence January 6, 2017
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0011647-2015

BEFORE: BOWES, J., NICHOLS, J., and RANSOM, J.*

MEMORANDUM BY RANSOM, J.:                    **FILED MARCH 27, 2018**

Appellant, Dominic Rountree, appeals from the judgment of sentence of eighteen to thirty-six years of incarceration followed by five years of probation, imposed January 6, 2017, following a jury trial resulting in his conviction for third-degree murder and possession of an instrument of crime.[1] We affirm.

We derive the following facts from the trial court opinion, which in turn are supported by the record.

> [In September 2015, Appellant lived in a house with his father, John Rountree ("John"), and Appellant's two brothers, Andre Rountree ("Andre"), and Jacquell Rountree, the decedent. Notes of Testimony (N.T.), 11/1/2016, at 71-73. The brothers] shared one room in the basement which was separated into three sections by curtains. *Id*. at 72-74. The decedent shared his section of the basement with his girlfriend, Brittney Clark [("Ms.

---

[1] *See* 18 Pa.C.S. §§ 2502(c) and 907(a), respectfully.

\* Retired Senior Judge assigned to the Superior Court.

Clark")], and their two children. *Id*. at 74. On the day of the incident, Andre [] had moved out of the house. *Id*. at 75-76.

[John testified that when he] returned home that day, the decedent, [Ms.] Clark, their two children and [John's] daughter, Fatima Rountree, were sitting in the living room. *Id*. [Appellant] arrived shortly thereafter and had a conversation with his father in the dining room. The dining room is adjacent to the living room. [Appellant] told his father that he wanted to use [Andre's] space in the basement for a short period of time. *Id*. at 77-78. John [] told [Appellant] that he did not want him to take [Andre's] space []. *Id*. [Appellant] persisted, going back and forth with his father, in his quest to obtain the space until the decedent entered the dining room and told the [Appellant,] "you heard what dad said." *Id*. at 78. [Appellant] answered: "I was just talking to dad. Let me and dad talk." *Id*. [Appellant] and the decedent began to argue loudly. *Id*. John [] walked into the kitchen, which is adjacent to the dining room, to get a sandwich. *Id*. at 79. When he came out to go upstairs, he heard [Appellant] say to the decedent: "I don't want to argue with you no more. I am going." *Id*. at 80. John [] then went upstairs and ate his sandwich. *Id*. Approximately two to six minutes later he heard shots, and [Ms.] Clark screaming. *Id*. at 81-82. John [] then returned downstairs and saw [Ms.] Clark holding the decedent on the front porch. *Id*. at 82-83. John [] went inside and called 911. The [Appellant] left. [] *Id*. at 84-85.

John [] further testified that approximately two to four months prior to the instant case, the decedent stabbed [Appellant] in the face.[2] *Id*. at 114-115. [Appellant] had to go to the hospital and returned with bandages in his face. *Id*. at 115. He refused to press charges against his brother. N.T., 11/3/2016, at 111. It was [John's] impression that it was not a serious incident. N.T., 11/1/2016, at 114-115.

[Ms.] Clark testified that when [Appellant] was talking to John [] about using [Andre's] space in the basement, the decedent interrupted and he and [Appellant] began to argue. N.T. 11/2/16, at 22-23. They got into each other's face[s] and both went down into the basement. *Id*. at 28-29. After approximately three to

---

2 The stabbing occurred in the month preceding the incident underlying this appeal. N.T., 11/3/2016, at 160-62.

- 2 -

five minutes, the decedent returned to the dining room. Approximately one minute later, [Appellant] came upstairs. The decedent stood up and said: "What are you going to do with that?" [Ms.] Clark went to get her son who was sitting in a highchair at the table because she saw [Appellant] holding a silver gun and putting bullets into it. ***Id***., at 32-34, 36. The decedent then stood in front of [Ms.] Clark and their son and reached for the gun. He was approximately two to three feet away from [Appellant] and put his right hand out. The decedent was not trying to attack [Appellant] but was trying to retrieve the gun. ***Id***. at 39. [Appellant] then took a step back, aimed at the decedent's lower abdomen and shot the gun. ***Id***. at 40. The decedent stumbled back and [Appellant] shot again. ***Id***. at 41. The decedent turned and ran toward the front door. ***Id***. at 43. [Appellant] followed the decedent and shot at him a third time striking him in his back. ***Id***. at 44. [Appellant] followed the decedent onto the front porch and began to pistol whip the decedent. [Appellant] then ran down the steps[. ] ***Id***. at 50-51.

[Ms.] Clark further testified that on a previous occasion the decedent had threatened [Appellant] with a knife but was unarmed on the date of the incident. ***Id***. at 97.

[Associate Medical Examiner Dr. Khalil Wardak [("Dr. Wardak")] performed the autopsy on the decedent [and discussed his findings and conclusions in a document titled, Death Certificate Information"]. N.T. 11/3/16, at 5-22. The decedent suffered two gunshot wounds, one to the elbow and one to the right lower back. ***Id***. at 10. The bullet that entered the back went through the decedent's heart, lung and liver. ***Id***. at 11. It was the fatal wound. ***Id***. at 13. [Dr. Wardak testified that the gunshot wound to the right lower mid-back travelled right to left, back to front, and upward and became lodged in the left, front side of the body. ***Id.*** at 11, 16. Dr. Wardak noted the location of the entrance, exit and retrieval points of the bullets that struck decedent's body on a body diagram. This diagram depicted that the bullet that entered from the right mid-back was recovered from the decedent's right front chest.] ***Id***.at 10.

A toxicology test revealed that the decedent had PCP in his blood in the amount of 100 micrograms per milliliter. Dr. Wardak testified that the concentration of PCP in an individual's blood does not reflect the behavior of the individual. Rather, it depends on the mode of use; whether ingested, smoked, or injected, and

genetic factors, such as whether the individual is a fast or slow metabolizer. Dr. Wardak opined that the only way to know how the drug affects an individual is to observe their behavior. *Id*. at 18-33.

[Appellant] testified that he shot his brother in self-defense. He and his brother had a volatile relationship which at times became physical. Approximately one month prior to this incident, the decedent stabbed him in his face requiring [Appellant] to get stitches. *Id*. at 100.

On the evening in question, [Appellant] was speaking with his father when the decedent interrupted and an argument ensued. [Appellant] testified that the decedent got within five feet of him and he could tell the decedent was intoxicated so he left the room and went down to the basement. *Id*. The decedent followed him downstairs and told him "I will f--- you up" but then went back upstairs. [Appellant] wanted to go to his mother's house to enlist her aid in quelling the tension. When he went upstairs to leave, the decedent pulled out a knife and popped the switchblade. *Id*. at 102. [Appellant] retreated to the basement where he grabbed his sister's boyfriend's gun to scare the decedent so [Appellant] could exit the house. *Id*. at 103. Upon seeing [Appellant] with the gun, the decedent said, "What the f--- are you going to do with that?" *Id*. at 104. [Appellant] pulled the slide back and a live round ejected onto the floor. *Id*. The decedent then jumped toward the Defendant and he reacted by firing the weapon. The decedent looked at his arm where he had been shot and was still coming toward [Appellant], so [Appellant] shot him again. [Appellant] then tried to get out of the front door and the decedent grabbed him. A tussle ensued which spilled out onto the front porch. [Appellant] punched the decedent in the head two times and ran away. *Id*. at 107-08.

Trial Court Opinion, 6/1/17, at 1-6 (some formatting added).

In November 2016, Appellant was convicted of the aforementioned charges. In January 2017, Appellant was sentenced to eighteen to thirty-six years of incarceration followed by five years of probation. Appellant timely filed a post-sentence motion, which the court denied in February 2017.

Appellant timely appealed and filed a court-ordered Pa.R.A.P. 1925(b) statement. The trial court issued a responsive opinion.

Appellant presents the following questions for our review:

1.    Whether the adjudication of guilt for Murder in the Third Degree and PIC is based upon insufficient evidence where the Commonwealth failed to prove beyond a reasonable doubt that the Appellant possessed the requisite mental state for Third Degree Murder and where the Appellant possessed a firearm because he believed it to be necessary to defend himself?

2.    Whether the adjudication of guilt is against the weight of the evidence and shocking to one's sense of justice where the evidence showed that the victim was the aggressor, where the victim was high on PCP, where the victim had previously assaulted the Appellant and where the testimony of the Assistant Medical Examiner was at variance with the documentary evidence showing the location of the victim's wounds?

Appellant's Brief at 6 (order of issues reversed for ease of analysis).

In his first issue, Appellant claims that the evidence was insufficient to sustain his conviction for third-degree murder and challenges his conviction for possession of an instrument of crime as it is predicated on the murder conviction. **See** Appellant's Brief at 23-25. Specifically, Appellant contends that the evidence fails to show he possessed the requisite malice to be convicted of third-degree murder or, similarly, possessed an instrument of crime with the intent to employ it criminally, as the decedent believed he was justified in using deadly force on the decedent. **Id**. at 25.

We review a challenge to the sufficiency of the evidence as follows.

In determining whether there was sufficient evidentiary support for a jury's finding [], the reviewing court inquires whether the proofs, considered in the light most favorable to the

Commonwealth as a verdict winner, are sufficient to enable a reasonable jury to find every element of the crime beyond a reasonable doubt. The court bears in mind that: the Commonwealth may sustain its burden by means of wholly circumstantial evidence; the entire trial record should be evaluated and all evidence received considered, whether or not the trial court's rulings thereon were correct; and the trier of fact, while passing upon the credibility of witnesses and the weight of the evidence, is free to believe all, part, or none of the evidence.

*Commonwealth v. Diggs*, 949 A.2d 873, 877 (Pa. 2008) (citations omitted).

To convict a defendant of third-degree murder, as provided in Section 2502(c), the Commonwealth "need only prove that the defendant killed another person with malice aforethought." *Commonwealth v. Santos*, 876 A.2d 360, 363 (Pa. 2005). Our Supreme Court has defined malice in the following terms:

[Malice] comprehends not only a particular ill-will, but every case where there is wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, although a particular person may not be intended to be injured.

*Commonwealth v. Thomas*, 594 A.2d 300, 301 (Pa. 1991). "Malice may be inferred from 'the attending circumstances of the act resulting in the death.'" *Commonwealth v. Lee*, 626 A.2d 1238, 1241 (Pa. Super. 1993) (quoting *Commonwealth v. Gardner*, 416 A.2d 1007, 1008 (Pa. 1980)). Malice may be inferred by the actor's use of a deadly weapon upon a vital part of the victim's body. *Commonwealth v. Ventura*, 975 A.2d 1128, 1142 (Pa. Super. 2009).

When one employs deadly force, as Appellant did here, the elements of a claim of self-defense are that the individual (1) reasonably believed that

force was necessary to protect himself against death or serious bodily injury; (2) was free from fault in provoking the use of force against him; and (3) did not violate any duty to retreat. **Commonwealth v. Mouzon**, 53 A.3d 738, 740 (Pa. 2012); **see also** 18 Pa.C.S § 505(b)(2) (pertaining to use of force in self-protection). A defendant does not have a burden to prove a claim of self-defense. **Commonwealth v. Torres**, 766 A.2d 342, 345 (Pa. 2001). Rather, once a defendant introduces some evidence to justify a finding of self-defense, then the issue is properly before the fact-finder and the Commonwealth bears the burden to disprove the defense beyond a reasonable doubt. **Id**. Shooting a victim in the back clearly undermines a claim of self-defense. **Commonwealth v. Yanoff**, 690 A.2d 260, 265 (Pa. Super. 1997) (evidence was sufficient to find appellant guilty of third-degree murder where victim initiated scuffle with appellant and appellant shot victim four times in the back as victim ran away).

Viewing the evidence in the light most favorable to the Commonwealth as verdict winner, the Commonwealth disproved Appellant's claim of self-defense beyond a reasonable doubt and proved that Appellant acted with malice in the killing of the decedent. Specifically, the Commonwealth presented undisputed forensic evidence that the decedent was shot two times, one of which entered the decedent's abdomen from his back. The testimony of both Appellant and Ms. Clark established that Appellant first shot the decedent in the arm. It was thus reasonable for the jury to infer that the shot to the decedent's back occurred after the non-fatal shot and further

undermined his claim of self-defense. *See Yanoff*, 690 A.2d at 265. In addition, Ms. Clark testified that, following the shots, Appellant proceeded to pistol whip the decedent. While Appellant attempted to establish that the decedent, who had stabbed Appellant a month prior, charged him with a switchblade, the Commonwealth presented more than sufficient evidence to show that Appellant did not act in self-defense in shooting the decedent in the back and continuing to hit him after Appellant shot him.

Additionally, "[a] person commits a misdemeanor of the first degree if he possesses any instrument of crime with intent to employ it criminally." 18 Pa.C.S. § 907(a). In *Commonwealth v. Weston*, 749 A.2d 458, 461 (Pa. 2000), our Supreme Court held that where a defendant asserted self-defense but was convicted of voluntary manslaughter, the voluntary manslaughter conviction did not negate the criminal intent necessary to sustain his conviction for possession of an instrument of crime. *Weston*, 749 A.2d at 461 (Pa. 2000). Moreover, a conviction by the jury of possession of an instrument of crime "may be sustained when a defendant has been otherwise acquitted of related offenses involving the use of that instrument of crime." *See Commonwealth v. Moore*, 103 A.3d 1240, 1245-50 (Pa. 2014) (relying on the "long-standing principles that juries may issue inconsistent verdicts and that reviewing courts may not draw factual inferences in relation to the evidence from a jury's decision to acquit a defendant of a certain offense").

Appellant's conviction for possession of an instrument of crime was not, in fact, dependent on his conviction for third-degree murder. *See Moore*,

103 A.3d at 1250. In the instant matter, Appellant used a gun to kill the decedent, shooting him twice, once in the back. Coupled with Ms. Clark's testimony that Appellant also pistol-whipped Appellant, the jury could conclude that Appellant possessed the gun with the intent to employ it criminally.

In his second claim, Appellant argues that his conviction for third-degree murder is against the weight of the evidence and so contrary to the evidence that it shocks one's sense of justice. **See** Appellant's Brief at 18-23. Appellant contends that (1) the evidence established that the decedent was the aggressor in the instant matter and (2) a discrepancy between the location of the bullet in a diagram exhibit and the Assistant Medical Examiner's testimony called into question the accuracy of the entrance location of the fatal bullet. Appellant's Brief at 19, 22.

The law regarding weight of the evidence claims is well-settled.

A claim alleging the verdict was against the weight of the evidence is addressed to the discretion of the trial court. Accordingly, an appellate court reviews the exercise of the trial court's discretion; it does not answer for itself whether the verdict was against the weight of the evidence. It is well settled that the jury is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses, and a new trial based on a weight of the evidence claim is only warranted where the jury's verdict is so contrary to the evidence that it shocks one's sense of justice. In determining whether this standard has been met, appellate review is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion.

*Commonwealth v. Houser*, 18 A.3d 1128, 1135-36 (Pa. 2011) (citations and internal quotation marks omitted). A trial court's denial of a post-sentence motion based on a weight of the evidence claim is the least assailable of its rulings. *Commonwealth v. Nypaver*, 69 A.3d 708, 717 (Pa. Super. 2013) (internal quotations omitted) (citing *Commonwealth v. Sanders*, 42 A.3d 325, 331 (Pa. Super. 2012). Additionally, "[a] weight of the evidence claim concedes that the evidence is sufficient to sustain the verdict[.]" *Commonwealth v. Lyons*, 79 A.3d 1053, 1067 (Pa. 2013) (citations omitted), *cert. denied*, 134 S.Ct. 1792 (U.S. 2014).

As previously discussed, the Commonwealth "need only prove that the defendant killed another person with malice aforethought" to convict Appellant of third-degree murder. *Santos*, 876 A.2d at 363. Also, malice may be inferred by the use of a deadly weapon upon a vital part of the victim's body. *Ventura*, 975 A.2d at 1142.

Here, Appellant asserts that the decedent's prior conduct in stabbing Appellant in the face, his initiative to enter the argument between Appellant and John, and the presence of PCP in his blood lead to the conclusion that the decedent was the initial aggressor in the incident and the instant verdict shocked the conscious. Appellant's Brief at 19. The fact finder was free to believe that the decedent was the initial aggressor in the incident. However, the jury was also free to balance that notion with the testimony of Dr. Wardak, who explained that the concentration of PCP in an individual's blood is inconclusive of the effect on the user's behavior. While there was clearly

- 10 -

evidence of aggression by the decedent, the jury was free to believe forensic evidence and testimony establishing that (1) Appellant shot the decedent twice, first in the arm and a second time in the back and (2) that Appellant continued to assault the decedent after the decedent incurred two gunshot wounds.

Appellant also asserts the jury ignored a serious discrepancy between the location of the bullet in the decedent's body diagram and the Assistant Medical Examiner's testimony. *Compare* Death Certificate Information, Commonwealth's Exhibit 35, at 4, *with* Body Diagram, Commonwealth's Exhibit 36. First, it is the role of the fact-finder to resolve discrepancies in the evidence. *Commonwealth v. Hilliard*, 172 A.3d 5, 14 (Pa. Super. 2017) ("Any conflicts or discrepancies in the evidence, which are questions regarding the weight and credibility of evidence, must be resolved by the fact-finder at trial.") Second, Appellant was free to impeach Dr. Wardak's credibility but failed to do so. N.T., 11/3/16, at 23-34. Indeed, the location of the bullet in decedent's chest was not even broached during the cross-examination of Dr. Wardark. *Id*. Further, balanced against this alleged discrepancy was the significant and uncontradicted evidence that the bullet entered the decedent in his back. *Id*. at 11, 13-15.

Based on the above, we cannot conclude that the verdict was so against the weight of the evidence as to shock one's sense of justice, and accordingly, the court did not abuse its discretion. *Houser*, 18 A.3d at 1136.

Judgment affirmed. Jurisdiction relinquished.

Judgment Entered.

_Joseph D. Seletyn_

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/27/18