J-S41010-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| HARRITH SALEEM BROWN | : | |
| | : | |
| Appellant | : | No. 1491 EDA 2024 |

Appeal from the Judgment of Sentence Entered November 2, 2023
In the Court of Common Pleas of Monroe County Criminal Division at
No(s): CP-45-CR-0001094-2020

BEFORE: MURRAY, J., KING, J., and SULLIVAN, J.

MEMORANDUM BY MURRAY, J.:                    **FILED DECEMBER 05, 2024**

Harrith Saleem Brown (Appellant) appeals from the judgment of sentence imposed following his jury convictions of two counts of second-degree murder and related offenses. After careful review, we affirm.

Appellant participated in a robbery in December 2019, which resulted in the deaths of Khalil Durante (Khalil) and Dylan Beinert (Dylan) and the non-fatal shooting of Walter Durante (Walter).

On January 17, 2020, the Commonwealth filed a criminal complaint charging Appellant with, *inter alia*, the above-described offenses. Appellant was later taken into custody pursuant to an arrest warrant. Relevant to the instant appeal, police seized as evidence a red sweatshirt and two firearms. In July 2020, police applied for and obtained a search warrant to collect a DNA sample from Appellant.

On September 24, 2020, Appellant filed an omnibus pre-trial motion, which included 1) a motion to compel discovery, 2) an application for production of **Brady**[1] material, 3) an application for writ of *habeas corpus*, 4) a petition to establish the defense's budget for experts, and 5) a motion to file additional pre-trial motions as necessary.  Following a hearing, the trial court granted Appellant's motion to compel discovery, motion to produce **Brady** material, and motion to file additional pre-trial motions.  The court directed the parties to file briefs concerning Appellant's application for writ of *habeas corpus*.  Appellant and the Commonwealth complied.  Thereafter, the trial court denied Appellant's application for writ of *habeas corpus* as to all charged offenses.

Following a jury trial, Appellant was convicted of the following offenses:

- Count 1: second-degree murder (Dylan)

- Count 2: second-degree murder (Khalil)

- Count 3: conspiracy to commit robbery (Dylan)

- Count 4: conspiracy to commit robbery (Khalil)

- Count 6: aggravated assault (Dylan, Khalil, Walter), as an accomplice with Matthew Burke (Burke)

- Count 7: burglary

- Count 8: robbery – threaten serious bodily injury (Dylan), and robbery – inflict serious bodily injury (Dylan) as an accomplice with Burke

_____

[1] **Brady v. Maryland**, 373 U.S. 83 (1963).

- Count 9: robbery – threaten serious bodily injury (Khalil), and robbery – inflict serious bodily injury (Khalil) as an accomplice with Burke

- Count 10: robbery – threaten serious bodily injury (Walter), and robbery – inflict serious bodily injury (Walter) as an accomplice

- Count 11: robbery – threaten serious bodily injury (Klaudia Malec (Klaudia))

- Count 12: robbery – threaten serious bodily injury (Dane Williams (Dane))

**See** Order (Verdict), 8/18/23; Motion to Amend Information, Exhibit A (Jury Verdict Sheet); Order (Sentencing), 10/24/23.[2]  The trial court deferred sentencing for preparation of a presentence investigation report.  On October 24, 2023, the trial court sentenced Appellant to life in prison without the possibility of parole, plus 33½ to 67 years.

The Commonwealth subsequently filed an unopposed motion for reconsideration, asserting the individual sentences imposed for two of Appellant's robbery convictions (graded as second-degree felonies) exceeded the statutory maximum.  **See** 18 Pa.C.S.A. § 1103(2) (providing a sentence imposed for a second-degree felony shall not exceed 10 years); **see also** Order (Sentencing), 10/24/23 (at Counts 11 and 12, imposing prison terms of 5½ to 11 years).  On November 2, 2023, the trial court issued an amended sentencing order and imposed 5 to 10-year sentences at Counts 11 and 12.

_____

[2] 18 Pa.C.S.A. §§ 2502(b), 903, 3702(a)(1), 3502(a)(1)(ii), 3701(a)(1)(i) and (ii).

Thus, Appellant's amended aggregate sentence was life in prison without the possibility of parole, plus 32½ to 65 years.

On November 3, 2023, Appellant filed a post-sentence motion challenging, *inter alia*, the weight of the evidence supporting his convictions.

Appellant filed a *pro se* notice of appeal on December 20, 2023, before the trial court ruled on his post-sentence motion. The trial court ordered the clerk of courts to forward Appellant's *pro se* appeal to trial counsel. Separately, the trial court ordered Appellant to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Trial counsel, in turn, filed a motion to withdraw from representation, arguing Appellant's *pro se* filing indicates that Appellant wished to proceed without counsel's assistance. The trial court denied trial counsel's motion to withdraw, granted an extension of time in which to file a Rule 1925(b) concise statement, and canceled the previously-scheduled post-sentence motion hearing. Ultimately, by an order entered on February 12, 2024, this Court quashed Appellant's *pro se* appeal as interlocutory.

The trial court rescheduled the post-sentence motion hearing. By an order and opinion entered on May 3, 2024, the trial court denied Appellant's

post-sentence motion.  Appellant filed a notice of appeal on May 24, 2024.[3]

Appellant and the trial court have complied with Pa.R.A.P. 1925.[4]

Appellant raises the following issue for review:

Where the Commonwealth failed to corroborate the circumstantial evidence of guilt with fingerprint or DNA evidence and otherwise failed to provide a reasonable explanation for the absence of such evidence where it should almost certainly be found, is the guilty verdict of the jury against the weight of the evidence, thus entitling [Appellant] to a new trial?

Appellant's Brief at 7.

Appellant acknowledges there was sufficient circumstantial evidence to support his convictions.  *Id.* at 16.  However, Appellant argues the physical evidence offered by the Commonwealth at trial (*i.e.*, red sweatshirt and shotgun) was not connected to Appellant through forensic testing.  *Id.* at 13-14.  "In fact, police were unable to recover Appellant's fingerprints or DNA from the crime scene, [Deani Powell's (Deani)] vehicle in which [Appellant] allegedly traveled to and from the crime scene[,] or any other item of physical evidence…."  *Id.* at 14.  According to Appellant, the Commonwealth failed to

---

[3] We note that the trial court denied Appellant's post-sentence motion beyond the 120-day time period for rendering its decision.  *See* Pa.R.Crim.P. 720(B)(3)(a) (directing that the trial court must decide a post-sentence motion within 120 days, or the motion shall be deemed denied by operation of law).  However, in light of the procedural delays resulting from Appellant's premature *pro se* appeal, we decline to find a violation of Rule 720 and deem Appellant's notice of appeal timely filed.

[4] In its Rule 1925(a) statement, the trial court stated it would rely on its opinion and order denying Appellant's post-sentence motion.

explain the complete lack of DNA or other forensic evidence tying him to the crime. *Id.* at 16.

We adhere to our well-established standard of review:

A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.

An appellate court's standard of review when presented with a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.

*Commonwealth v. Arias*, 286 A.3d 341, 352 (Pa. Super. 2022) (citation omitted). Further, "[o]ne of the least assailable reasons for granting or denying a new trial is the lower court's determination that the verdict was or was not against the weight of the evidence…." *Commonwealth v. Morales*, 91 A.3d 80, 91 (Pa. 2014).

The trial court fully detailed the facts presented to the jury:

Walter …[,] then age 62, resided in a home at 1718 Silver Maple Road in the Sun Valley development in Chestnuthill Township, Monroe County [(the Durante house)]. [Walter's] son, Khalil [], age 23; Dylan [], age 24; and Dane [], age 28; also resided there. Each of them had their own room in the house. On the night of December 4, 2019, Klaudia [], then age 21, was visiting with … Dylan [], in his room. She testified that Dylan was selling "small amounts" of marijuana from the [Durante] house and that he was advertising his marijuana business in videos on social media depicting the different kinds of marijuana he was selling. A friend of theirs, Chris Staciak [(Chris)], was also visiting with Dylan when

Klaudia arrived at 7:00 p.m. Chris left at 9:30 p.m. and Klaudia intended to leave soon thereafter to go to another friend's house. Dylan was expecting the arrival of "a girl from Tinder," a dating website, who was coming over to "chill" or hang out.

The girl arrived at [the Durante hose at] approximately 10:00 p.m. Klaudia and Dylan were sitting in chairs in Dylan's room when she arrived and introduced herself as "Tiani." She was later identified as Deani []. She had a friendly manner. Dylan had marijuana in mason jars inside an open Gucci box on the floor of his room, and invited Deani to sit on his bed while they introduced each other and talked. Deani had her cell phone out and was texting while she talked to Dylan and Klaudia. Dylan asked [Deani] if she wanted to smoke marijuana and she said yes. [Deani] then said that she wanted to buy a "dime" and had to go out to her car to get her wallet. [Deani] left the room and Dylan followed.

A short time later, an unknown male rushed into the bedroom where Klaudia was sitting and pointed a gun at her face. He was wearing a dark hoodie sweatshirt and had on a "pig" mask that was flesh-colored and had a snout. He told her to put her hands up. [Klaudia] was terrified[,] and she did so. Dylan then entered the room, followed by another assailant wearing a red hoodie sweatshirt and a black mask, with a long gun pointed at Dylan's back. Dylan appeared angry[,] and when he looked at [Klaudia] in the chair, he turned around and tried to wrestle the gun from his assailant. The man guarding Klaudia then turned to join in the fight with Dylan. Khalil then came from another room in the house and joined in the fight outside Dylan's bedroom. Klaudia then heard two shots. The two assailants ran out of the room. Khalil was on the floor on his knees in the hallway and crawled toward [Klaudia] in Dylan's bedroom, telling her to call 911. [Klaudia] started to do so when someone yelled "where's the white B at." She then saw a male in a blue hoodie sweatshirt who was not wearing a mask, brandishing a handgun. Klaudia responded that she was in the bedroom. He told her to get up and lie down on the floor in the hallway, which she did. In doing so, she had to crawl over to Dylan, who was deceased and lying in the hallway. The man in the blue hoodie told Khalil to check Dylan for a pulse, which he did and did not find one. He told Khalil to lie down in Dylan's room. The other assailants rushed into Dylan's room[,] where they took the Gucci box and the related marijuana and paraphernalia. At that point, [Walter] yelled from

another room for the perpetrators to take everything and leave. The man in the blue hoodie then directed Walter to join Klaudia and Khalil, and directed all three of them to cover their eyes and walk backwards to the side porch of the house. Once there, [the man in the blue hoodie] brought them back into the kitchen. At that point, Dane [] came out of his room in the house and made himself known to the intruders. The man in the blue hoodie ushered them all outside the house and made them lie down in the snow. He then told Khalil to say his prayers and when he did so[, the assailant] shot [Khalil] in the back of the head. When [Walter] cried out, the assailant walked over and shot him in the ear. The man in the blue hoodie then ran to a waiting car out on the street and left the scene. The other two assailants had already left.

Trial Court Opinion, 5/3/24, at 4-6 (citations to record omitted).

At trial, the Commonwealth presented the testimony of Zaire Burkett (Burkett),[5] who was involved in the robbery:

Burkett testified that he was 20 years old on December 4, 2019. He had gone to New York that day with [] Burke and Deani [], Burke's girlfriend. [Burkett] had told Burke that he wanted to buy some "weed" that day. After they returned to Allentown, Burkett left them and went to a friend's house. Burke called him and told him he knew where Burkett could buy some weed. Burkett rejoined Burke and Powell in the car. Burke had shown Burkett [Dylan's] marijuana video the day before, and when Burkett got in the car[,] Burke told him "it would be nice if we could get everything he showed me in the video."

Burkett saw [Appellant] on the street outside the car and asked him if he wanted to go with them to buy weed. When asked why [Burkett] invited [Appellant], who was a friend of a friend and not someone Burkett knew well, he testified:

Earlier that day I seen Burke with a gun in his glove compartment, and he kept taking it in and out of it. I asked

_____

[5] "The jury was aware that Burkett was testifying as a co-conspirator[,] and they were instructed that he could be considered by the jury as a polluted source." Trial Court Opinion, 5/3/24, at 4.

- 8 -

[Appellant] to come with me because, like I said, we have a mutual friend. I don't really know these other two people. If he's telling me he wants to basically take something from his friends, associates, or whoever these people are that he showed me, I assumed he would have no problem doing the same thing to me because I don't really know him.

[Appellant] agreed to go if he could get some of the marijuana. Deani [] got out of the car and left. They then drove to [the Durante] house in Monroe County. Burke drove, and [Appellant] got in the front seat. Burkett was in the rear of the car. When they got to [the Durante] house, they waited on the street outside. Deani [] had driven to the scene in her car, and had gone into the house. She texted Burke that there were 4 to 6 people inside and they had guns. Burke told [Appellant] and Burkett that the house occupants "got a lot of stuff. We can get all of that stuff." [Burke] replayed the Dylan [] marijuana video for Burkett and [Appellant] to see. Burke went into his trunk and brought back a shotgun and two masks, which Burkett and [Appellant] put on. They watched the house and waited for Deani [] to come out. When she did, they got out of the car and approached the house. Burkett and [Appellant] had masks on[,] and [Appellant] was carrying the shotgun. Burke had his pistol.

When they got inside the house, Burkett testified that [Appellant] had the shotgun aimed at [Dylan's] back, and the scuffle began with them. Burkett heard a shot and was knocked down. When he got up[,] he saw Khalil with blood on his shoulder. [Burkett] saw Burke in the doorway, who told him to get the marijuana and paraphernalia in the bedroom and get out. Burkett grabbed the marijuana and ran out of the house, returning to the car he came in. He started the car and drove it up to where he could see the house. He saw the house occupants being led outside. He later heard two or three shots and saw Burke running toward the car. Burke got into the driver's seat and asked where "his girlfriend" was. Burkett said he didn't know, "they" must have left. Burke called Deani [] and they agreed to meet at the Sheetz gas station in Northampton County.

They drove to the gas station, and parked next to [Deani's] car. [Deani] and [Appellant] were in the car. [Deani] and Burke spoke and then drove their vehicles to the gas pumps, while [Appellant] and Burkett went into the gas station. [Appellant] asked him "[W]hat's going on? What we get?"

[Appellant] and Burkett came out of the gas station. [Appellant] and Deani [] continued to Allentown in [Deani's] car[,] and Burke and Burkett left the gas station in Burke's car. The perpetrators then met in Allentown and divided the spoils from the robbery.

*Id.* at 7-9 (citations to record omitted).[6]

Video surveillance from Sheetz corroborated Burkett's account of the actors' meeting after the robbery:

The video shows the [Deani] and Burke vehicles entering the lot and parking. [Appellant] can be seen walking to the Sheetz store in just a t-shirt on a cold December night. Burke and [Deani] pulled their vehicles up to the gas pumps. Burkett walks into the Sheetz store. [Appellant] and Burkett greet each other and are seen conversing. Burkett and [Appellant] come out of the Sheetz store; Burkett gets in the Burke vehicle and [Appellant] gets in the [Deani] vehicle, and the vehicles depart.

*Id.* at 14.

During the investigation, Detective Sergeant Brian Webbe (Det. Sgt. Webbe) obtained outdoor camera footage from one of Walter's neighbors:

This footage showed two cars arriving at the Durante house that night. The first car was driven to the scene[,] and at 10:06 p.m.[,] a woman [Det. Sgt.] Webbe identified as Deani [] got out of a car and walked up to the side of the door of the Durante house[,] while looking at a cell phone. At 10:23 p.m., a second car arrived in front of [the Durante house] and three males got out and spread out, one on each side and one in the middle. The three men quickly walked toward the [Durante] house through the woods. The individual in front was carrying a long gun. The individual in the back had a pistol. At 10:25 p.m., all four of the group had entered the house. The next thing seen on the video is Deani []

_____

[6] During a search of Deani's vehicle, police seized a loaded Remington model 870 express super magnum 20-gauge shotgun and a .40 caliber Hi Point pistol grip rifle. *See* Trial Court Opinion, 5/3/24, at 14.

- 10 -

exiting the Durante house from the side door and going back to her car. She backed it out of the driveway and parked on the street. As she was doing that, one of the intruders wearing a mask ran out of the house carrying a bag and went to the other car parked out on the street and opened the rear door of the car. He then left that car and ran up Silver Maple Road[,] where he got in [Deani's] car and the two of them left the scene.

*Id.* at 9-10 (citations to record omitted).

Police obtained Deani's cell phone after her arrest and reviewed her phone's location data during the relevant time period. *See* N.T., 8/17/23, at 73. The cell phone location data indicated Deani was at the Durante house. *See id.* at 76. Det. Sgt. Webbe emphasized Deani's cell phone location data placed her at a particular intersection (Merwinsburg Road and Jonas Road) three times after Deani left the Durante house. *See id.* at 75-76. After leaving the scene,

[Deani] then traveled down Merwinsburg Road to Route 115. She took Route 115 to Route 209 in Brodheadsville, to Route 33 and then continued south toward Lehigh Valley. She exited onto Route 22, but immediately turned around and went north on Route 33 to the exit for Route 248, where she left Route 33 and pulled into the Sheetz gas station. There were no gaps or stops in [Deani's] route of travel as shown by her cell[ ]phone. The drive from the intersection of Route 209 and Route 33 was 24 miles[,] and [Deani] averaged 61 miles per hour on the trip. During this trip, [] Burke and Deani [] shared a text exchange to designate the Sheetz meeting location.

Trial Court Opinion, 5/3/24, at 11 (citations to record omitted).

The intersection at Merwinsburg and Jonas Roads (the intersection) is of particular import because police found a red hoodie sweatshirt at that location. *Id.* at 10; *see also* N.T., 8/16/23, at 78 (Pennsylvania State Police

Trooper Michael Strenchock (Trooper Strenchock) testifying that a patrol unit found a red "Kappa" brand sweatshirt on the side of the road at the intersection). Trooper Strenchock testified it looked like the hoodie "was placed there pretty recently[,]" as it was snowing that night, and there was no snow on top of the sweatshirt. N.T., 8/16/23, at 77; *see also* Commonwealth's Exhibit 19 (photographs of the red sweatshirt found at the intersection).

Significantly, Klaudia identified the assailant who held Dylan at gunpoint as wearing a red hooded sweatshirt. *See* N.T., 8/16/23, at 45. Further, Sergeant Ryan Farrell (Sgt. Farrell) located a picture of Appellant on the Facebook page of Cassius Miller.[7] *See id.* at 168-70. The photo depicted Appellant wearing "a red-hooded sweatshirt, that [] was the same that was found during the investigation." *Id.* at 169-70.

Moreover, the Commonwealth introduced as evidence letters Appellant sent to Steven Settle (Mr. Settle) from prison. *See id.* at 165, 167 (Sgt. Farrell testifying that Mr. Settle is Appellant's relative and Burkett's friend). Sgt. Farrell testified concerning one letter as follows:

> [ADA]. So with reference to this letter … I'm going to read the following quote and ask you a question about it, quote, *Me and you know I haven't been in your house in a long time. You know*

---

[7] Police identified Cassius Miller as an individual referred to as "Kash" in a letter written by Appellant. *See* N.T., 8/16/23, at 167-68. In the letter, Appellant wrote "the tipster is Kash," in reference to a tipster who provided Appellant's New York benefits card to police. *Id.* at 167; *see also* Commonwealth's Exhibit 16 (various letters written by Appellant).

*how I leave clothes around the crib. Your man had to come to the house without you knowing and grab one of my old sweaters. Feel me.*

Now, is that of significance to you with reference to your investigation.

A. Yes, it was.

Q. And why is that?

A. I believe in that statement [Appellant] confirms his ownership of that red sweatshirt that was found during the investigation.

Q. On the last line on page 2 of that letter[, Appellant] writes, quote, *Tell Flex he got to do me right.* The word "Flex," is that of significant to you in this investigation?

A. Yes, it is.

Q. And why is that?

A. Flex is the – is another name for [] Burkett, one of [Appellant's] co-defendants.

….

Q. And then page 3 of the letter that I'm referring to … [Appellant] states, quote, *And you saying stop beating him up. You lucky I don't say it and Peter roll him myself.* That phrase "Peter roll," are you familiar with the meaning of that?

A. Yes, the meaning of Peter roll is beating someone to the point where they have to be rolled out of their residence or some building kind of in a fashion like a hospital gurney.

Q. The last item on this letter[, Appellant] goes on to quote, *Tell son to do the right thing for me. He ratted. If he talking other shit, you know what to say to the N. I need him to write an affidavit in my behalf. Tell him it's only right.*

**Id.** at 172-73 (emphasis added); **see also** Commonwealth's Exhibit 16.

- 13 -

Sgt. Farrell also testified concerning another letter Appellant sent to Mr. Settle:

Q. When [Appellant] asked Mr. Settle in that letter, quote, *I need Tuki to say he dropped me off at that gas station so I can meet a bitch.*[8]

The gas station that [Appellant] would be referring to would be which one?

A. That would be the Sheetz gas station established during the investigation [where] the [co-d]efendants met up after the incident.

….

Q. On line 16 of that letter, again, which was read, there's another slang reference, quote, *I need you to rock him to sleep for me. Tell him he's good after he does the right thing. He not going to listen to me cuz I really tried to rock him to sleep. LMAOO.*

The reference rock him to sleep, are you familiar with that slang reference?

A. Yes, that would be incorporating physical violence upon the individual.

Q. And the individual reference[d], that would be Flex?

A. Yes.

N.T., 8/16/23, at 175-78 (emphasis and footnote added); ***see also*** Commonwealth's Exhibit 16. Appellant also stated in this letter, "Tell [Tuki] to be my alibi[.]" Commonwealth's Exhibit 16.

_____

[8] The identity of "Tuki" is not apparent from the record.

Instantly, Appellant cites **Commonwealth v. Lyons**, 79 A.3d 1053 (Pa. 2013), in support of his contention that the lack of DNA evidence is fatal to the Commonwealth's case against him. In **Lyons**, the victim (the appellant's girlfriend) was found deceased in her parked car, with numerous stab wounds. **Id.** at 1057-58. The appellant admitted he was in the victim's car at the time of the assault, but claimed an unknown man wearing a yellow sweatshirt had attacked him and the victim. **Id.** at 1059.

Following the appellant's convictions of first- and third-degree murder, he filed a post-sentence motion raising, inter alia, a challenge to the weight of the evidence. **See id.** at 1061. The appellant argued the Commonwealth did not submit the victim's fingernail clippings for DNA testing. **Id.** at 1067. However, the forensic pathologist who performed the autopsy testified that the victim's fingernails were short, which made it unlikely she could have scratched the assailant and acquired DNA. **Id.** at 1060-61. The trial court rejected the appellant's claim, highlighting the forensic pathologist's statements, and indicating that the bulk of the evidence pointed to the appellant's guilt. **Id.** at 1067.

On review, our Supreme Court concluded the trial court had not abused its discretion in rejecting the appellant's weight claim. **Id.** at 1067-68. The **Lyons** Court reiterated the forensic pathologist's testimony that the victim's short fingernails "likely precluded her from obtaining her attacker's DNA" and

noted the Commonwealth had offered substantial forensic and testimonial evidence of the appellant's guilt. *Id.* at 1067.

Here, Appellant argues that, unlike in *Lyons*, the Commonwealth did not offer a plausible reason for the lack of DNA evidence tying him to the crime. Appellant's Brief at 16. The trial court addressed and rejected Appellant's assertion, again summarizing the above-described evidence. *See* Trial Court Opinion, 5/3/24, at 15-17. Distinguishing *Lyons*, the trial court acknowledged the lack of DNA evidence, but concluded:

> [T]he pieces of circumstantial evidence that [the Commonwealth] did present fit with the direct testimony, the video surveillance evidence, the [red] sweatshirt, the co-conspirator's conversations, photographs and videos on the internet[,] and [Appellant's] own statements and admissions[,] which were offered to prove [his] guilt. The jury knew that Burkett was a co-conspirator and was free to accept or reject his testimony based on their credibility determinations. The jury's verdict was supported by the evidence. The evidence presented during the trial was not vague, tenuous or uncertain. The verdict did not shock the conscience of the court.

*Id.* at 17.

Upon review, we discern no abuse of the trial court's discretion in denying Appellant's weight claim. We, like the trial court, disagree that *Lyons* is controlling under the circumstances of this case. *See*, *e.g.*, *Commonwealth v. Wall*, 953 A.2d 581, 586 (Pa. Super. 2008) (rejecting the appellant's weight claim where DNA evidence excluded the appellant as the contributor of sperm found on rape victim's panties, but that evidence also did not require a conclusion that the appellant did not rape the victim). During

closing arguments, defense counsel highlighted the lack of DNA and fingerprint evidence. *See* N.T., 8/18/23, at 32-33. The jury, as finder of fact, was "free to believe all, part or none of the evidence" and to assess the credibility of witnesses. ***Commonwealth v. Gause***, 164 A.3d 532, 541 (Pa. Super. 2017). As we discern no abuse of the trial court's discretion in its assessment of Appellant's weight challenge, Appellant's sole appellate claim lacks merit.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/5/2024